**Opinion issued March 9, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

————————————————

## NO. 01-09-00643-CV

————————————————

## ROBERT B. ALLEN, Appellant

## V.

## DEVON ENERGY HOLDINGS, L.L.C. F/K/A CHIEF HOLDINGS, L.L.C. AND TREVOR REES-JONES, Appellees

---

On Appeal from the 190th District Court
Harris County, Texas
Trial Court Case No. 2007-39183A

---

## OPINION ON REHEARING[1]

---

[1] We issued an opinion on July 28, 2011. Both parties moved for rehearing, and appellees moved for en banc reconsideration. We grant rehearing, withdraw our previous opinion and judgment, and substitute this opinion and judgment in their place. We deny the motion for en banc reconsideration as moot. *See Brookshire Brothers, Inc. v. Smith*, 176 S.W.3d 30, 33 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (op. on reh'g).

In this securities action, Robert Allen appeals from the trial court's summary judgment in favor of Devon Energy Holdings, L.L.C. formerly known as Chief Holdings, L.L.C. (Chief)[2] and its manager and majority owner, Trevor Rees-Jones.

**Introduction**

Two years after Allen redeemed his minority interest in Chief, Chief sold for almost twenty times the value used to calculate the redemption price. Alleging that Rees-Jones fraudulently induced him to redeem his shares, Allen sued Chief and Rees-Jones for violation of the Texas Securities Act (TSA), statutory and common law fraud, breach of fiduciary duty, and shareholder oppression. Allen asserts that Rees-Jones induced him to sell his ownership interest in Chief by making representations in a November 2003 letter and failing to disclose material changes that rendered those representations untrue or misleading in the intervening eight months between the date of the letter and his June 2004 redemption. He primarily claims that Rees-Jones withheld information concerning technological advances in horizontal drilling and Chief's significant lease acquisitions in an expanded area of an existing natural gas field, the Barnett Shale, both of which occurred after the redemption offer but before the redemption. Allen asserts that these undisclosed

---

[2] Devon Energy Production Company, L.P. bought Chief Holdings, L.L.C. in June 2006 and renamed the company Devon Energy Holdings, L.L.C. Allen brought suit against Rees-Jones and "Devon Energy Holdings, L.L.C. formerly known as Chief Holdings, L.L.C." Both parties treat Devon Energy Holdings as Chief's successor-in-interest.

facts directly impacted Chief's future business prospects and would have caused him to reject Chief's redemption offer.

Rees-Jones and Chief contend that, cognizant of the fast-changing nature of Chief's uncertain oil and gas investments, the parties contractually allocated to Allen the risk for any changes in Chief's value for the months between the redemption offer and the sale. They assert that, when Allen cashed in his modest investment in Chief for a lottery-size windfall of over $8 million, he voluntarily assumed all responsibility for investigating and evaluating his decision to redeem his shares—therefore he cannot claim now that he based his decision on Rees-Jones's analysis rather than his own. They further maintain that Rees-Jones's statements constituted opinion statements, which are not actionable in fraud, and that Allen's damages model is an impermissibly speculative attempt to recover the maximum payoff on a gamble Allen declined to take. They moved for summary judgment on these grounds, which the trial court granted. Allen appealed.

With respect to Allen's fraud claims, we hold that several, but not all, of the statements in Rees-Jones's November 2003 letter are actionable and that the redemption agreement does not bar Allen's fraud claims based on those statements. We decline to recognize a shareholder oppression claim but hold that Rees-Jones did not negate fiduciary duty claim. We hold that Chief conclusively established that Allen had certain knowledge that bars his TSA, common law, and statutory

3

fraud claims based on misrepresentation of the value of Chief or its assets at the time of the redemption or the appropriateness of the redemption price, but Chief did not otherwise disprove justified reliance or establish its "knowledge" defense under the TSA. Nor did Chief prove that Allen's TSA claims are barred by limitations or that Allen has no recoverable damages. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

### Factual Background

Allen and Rees-Jones became acquainted as partners at a law firm. Two years after they met, Rees-Jones left the firm to be an entrepreneur in the oil and gas industry. Ten years later, Rees-Jones solicited Allen to invest in a new oil and gas company, which eventually became Chief. Allen became an 8% equity owner in return for investing $700 and pledging a $34,300 certificate of deposit as collateral for a line of credit. Rees-Jones invested $6,000 and his "sweat equity" as the sole manager in return for a 60% ownership interest. Chief experienced phenomenal growth, due largely to its success in the Barnett Shale. By July 2001, Chief's fair market value had grown to an estimated $8.5 million. Chief offered a partial buyout of its members to facilitate an ownership incentive plan for two key employees. Allen accepted the offer, reducing his interest to 7.2%.

Chief continued to have success, and its value continued to increase. By Fall 2003, Chief was preparing to shift its resources toward production in the

4

"expansion" area of the Barnett Shale, where prospects were less certain than they had been in the "core" area. Rees-Jones decided to offer to redeem the other investors' remaining interests. Chief hired Haas Petroleum Engineering Services to perform an appraisal of Chief's oil and gas reserves, and it hired Phalon George Capital Advisors to assess Chief's market value based on the Haas reserve report. The Phalon report estimated Chief's net asset value at $138.3 million, after subtracting liabilities, and the minority members' interests at approximately $1.13 million per 1% interest after discounts for the sale of a minority interest and for lack of marketability.

In November 2003, Rees-Jones sent Chief's members a letter regarding his intent to make a redemption offer and attaching the Haas and Phalon reports. The letter contained Rees-Jones's pessimistic assessment of a number of facts and events that could negatively impact Chief's value in the future, including its shift from proven production in the Barnett Shale's core area to less-certain production in the expansion area. Rees-Jones also stated that Chief's first horizontal well appeared to be a dry hole drilled at a cost of $1.4 million, the approximately dozen wells drilled by other companies in the expansion area "would show to be non-economic," and "further technological advancement needs to be made in order for the Barnett Shale in the 'expansion' area to become economic."

The closing was delayed until June 2004. According to Allen, a number of

5

events occurred in the eight months between Rees-Jones's November 2003 letter and the June 2004 closing that rendered some of Rees-Jones's statements in the letter misleading or no longer true. Among these events were: reports of successes in the development of horizontal drilling—a technology perceived as vital to profitable development of the expansion area of the Barnett Shale; considerable acquisitions by Chief and its competitors in the expansion area; optimistic statements by industry insiders about the expansion area's potential profitability; and an estimated increase in Chief's value. In his affidavit, Allen asserts that he asked Rees-Jones whether the valuations needed to be updated and Rees-Jones responded that it "was not necessary."

Chief did not update the Haas or Phalon report after the initial redemption offer. Instead, Chief based the redemption price on the Haas and Phalon reports and included in the redemption agreement an "Independent Investigation" clause under which the seller recognized that the reports were not up-to-date and might not accurately reflect Chief's current value. The redemption agreement also contained a "Mutual Releases" clause and a general merger clause. Three of Chief's owners decided to redeem their interests; four owners retained their interests. Allen was among the sellers; Rees-Jones was among the remaining owners. Allen redeemed his interest in Chief for approximately $8.2 million.

Approximately one and a half years after the redemption, Chief's

6

management put Chief on the market. Six months later, Devon purchased Chief for $2.6 billion—nearly twenty times the value used to determine the redemption price. Rees-Jones told Allen after the 2006 sale that "the change in value was attributable to the advent of horizontal drilling," that horizontal drilling was the key that "unlocked" the expansion area, and that horizontal drilling had made the expansion area "worth more than he ever conceived." Allen denied knowledge of the advancements in horizontal drilling or the extent of Chief's post-November 2003 leasehold acquisitions.

Allen sued Chief and Rees-Jones. After some limited discovery, Chief and Rees-Jones moved for traditional summary judgment, which the trial court granted.

**Standard of Review**

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). Under the standard for traditional summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). A defendant moving for traditional summary judgment must negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

**Release**

Chief[3] sought summary judgment on the affirmative defense of "release," based on the provisions of the redemption agreement. The redemption agreement contains mutual releases under which Allen and Chief "fully and finally and forever settle, release and discharge each other" from "any and all claims, demands, rights, liabilities and causes of action of any kind or nature" relating to the redemption agreement, excluding breach of contract claims. Additionally, under the "Independent Investigation" clause, they released each other from "any claims that might arise as a result of any determination that the value of [Allen's] Interest at the [redemption] Closing was more or less than the Redemption Price." Allen does not deny that these releases bar all of his claims against Chief if they are enforceable. Instead, he asserts that (1) the releases are not enforceable because the redemption agreement was fraudulently induced and (2) even if otherwise enforceable, the releases are void with respect to Allen's TSA claims.

**A.     Enforceability of the releases in the redemption agreement**

"[F]raud vitiates whatever it touches[.]" *Estate of Stonecipher v. Estate of Butts*, 591 S.W.2d 806, 809 (Tex. 1979). Thus, a contractual release may be avoided by proof that it was fraudulently induced, and the parol evidence rule does

---

[3]     In the legal analysis, we refer to Chief and Rees-Jones, collectively, as "Chief" and to the summary judgment motions as "Chief's" summary judgment motion.

not bar evidence of such fraud. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011); *see also Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178 (Tex. 1997). Though a valid fraudulent inducement claim generally precludes parties from relying on a contract's terms, including its releases, the contract itself may preclude a valid fraudulent inducement claim if it (1) "clearly expresses the parties' intent to waive fraudulent inducement claims" or (2) "disclaims reliance on representations about specific matters in dispute." *Schlumberger*, 959 S.W.2d at 181; *see also Italian Cowboy*, 341 S.W.3d at 332; *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 61 (Tex. 2008).

Allen's redemption agreement does not waive fraudulent inducement claims specifically, and the general release of all claims arising out of the redemption agreement does not amount to a "clear[] express[ion of] the parties' intent to waive fraudulent inducement claims." *Schlumberger*, 959 S.W.2d at 181. Otherwise, all general releases would be immune to fraud. *Cf. Residencial Santa Rita, Inc. v. Colnia Santa Rita, Inc.*, No. 04-06-00778-CV, 2007 WL 2608564, at *3 (Tex. App.—San Antonio 2007, no pet.) (mem. op.) (reversing summary judgment on contractual release when plaintiff raised fact issue on fraudulent inducement); *Fletcher v. Edwards*, 26 S.W.3d 66, 75−77 (Tex. App.—Waco 2000, pet. denied) (reversing summary judgment on contractual release and "as is" clause when plaintiff raised issue of fact on fraudulent inducement); *Dunbar Med. Sys. Inc. v.*

9

*Gammex Inc.*, 216 F.3d 441 (5th Cir. 2000) (applying *Schlumberger* to hold that release containing "as is" and "merger" clauses could be avoided on basis of fraudulent inducement). Chief contends, however, that the redemption agreement's "Independent Investigation" and "Finality" clauses, taken together, "disclaim[] reliance on representations about specific matters in dispute." *Schlumberger*, 959 S.W.2d at 181. We address this argument, along with Chief's other arguments for defeating the reliance element of Allen's fraud claims, in the "Fraud" section below. Because we hold below that Chief has not conclusively defeated Allen's fraudulent inducement claims as a matter of law, Chief has necessarily failed to establish conclusively the enforceability of the redemption agreement's releases.

**B.     Enforceability of the releases under the TSA**

Because Chief has not conclusively established an enforceable release, the trial court erred to the extent it granted summary on the basis of Chief's affirmative defense of "release." Because we reverse the trial court's summary judgment on this ground, we need not reach the issue of whether section 33L of the TSA would also require reversal as to Allen's TSA claims.[4] *See* TEX. REV. CIV. STAT. ANN. art. 581–33L (West 2010) (prohibiting waiver of compliance with TSA provisions).

---

[4]     We recognize that if, Allen otherwise proves his TSA claim, but does not prove his fraudulent inducement claims, the trial court will face the issue of whether the releases in the redemption agreement are enforceable under the TSA. That issue is not necessary to our disposition of this appeal. *See* TEX. R. APP. P. 47.1.

10

# Fraud

Allen's fraud[5] claims against Chief include common law fraud and statutory fraud under the TSA[6] and the Business and Commerce Code.[7] Chief moved for summary judgment on the grounds that two elements of these claims fail as a matter of law: (1) the existence of an actionable statement and (2) reliance.[8]

---

[5] While Allen's claims are denominated as fraud claims, they are fraudulent inducement claims. Fraudulent inducement "is a particular species of fraud" that requires proof of the common law elements of fraud and a contract between the parties. *Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001).

[6] *See* TEX. REV. CIV. STAT. ANN. art. 581-33B.

[7] *See* TEX. BUS. & COM. CODE ANN. § 27.01.

[8] In its summary judgment motion, Chief argued that it was entitled to summary judgment on the element of "material misrepresentation or omission" because (1) Rees-Jones's statements in his 2003 letter were non-actionable opinions and (2) Rees-Jones's other material communications to Allen—the Phalon and Haas reports—were not misleading, particularly in light of the redemption agreement's "Independent Investigation" clause. We address the first argument here. We do not address the second argument—except to the extent it relates to the effect of the "Independent Investigation" clause, which we address separately—because, in his appeal, Allen does not rely on the content of the Phalon or Haas reports as containing misrepresentations or omissions that give rise to his fraud claims. Similarly, we do not address Chief's contentions that Rees-Jones's statements were not material because, essentially, only information relating to Chief's value at the time of redemption could be material to Allen's decision to redeem his interest. This was not a ground on which Chief requested summary judgment. Chief's summary judgment argument was that the statements were not statements of fact—they were statements of opinion; Chief's contention was not that any statements of fact were nevertheless not actionable because they were immaterial. Nor did Chief offer summary judgment evidence establishing that a "reasonable person" would not "attach importance to" and "be induced to act on" information regarding Chief's future prospects "in determining his choice of actions in the transaction in question." *Italian Cowboy*, 341 S.W.3d at 338. We limit our opinion to the grounds for summary judgment presented to the trial court on which a party has raised a point of error. *See* TEX. R. CIV. P. 166a(c) ("The

11

## A.    Actionable v. non-actionable statements

The first element of a fraud claim is that there is a statement concerning a material fact. *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). A pure expression of opinion is not a representation of material fact and thus is not an actionable basis for a fraud claim. *Italian Cowboy*, 341 S.W.3d at 337–38; *Faircloth*, 898 S.W.2d at 276. "Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made." *Italian Cowboy*, 341 S.W.3d at 338 (quoting *Faircloth*, 898 S.W.2d at 276). Courts consider circumstances like the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and hearer's knowledge, and whether the statement relates to the present or future. *Faircloth*, 898 S.W.2d at 276.

There are exceptions to the general rule that opinions are not actionable in fraud. Statements of opinion may be actionable when (1) the speaker expresses the opinion with knowledge that it is false, (2) the speaker has superior knowledge and should have known that the other party was justifiably relying on the speaker's superior knowledge, or (3) the statement of opinion is so intertwined with other misstatements of fact that the representation as a whole amounts to a false

motion for summary judgment shall state the specific grounds therefor."); TEX. R. APP. P. 33.1, 47.1.

12

representation of fact. *Id.* at 276−77.

Statements regarding future events generally fall into two categories: predictions and promises to perform. Because the future is generally unascertainable, these statements are typically non-actionable in fraud. *See, e.g.*, *Trenholm*, 646 S.W.2d at 930. There are exceptions to this rule as well. Predictions are actionable if the speaker purports to have special knowledge of facts that will occur or exist in the future. *Trenholm*, 646 S.W.2d at 930; *cf. Anglo-Dutch Petroleum Int'l, Inc. v. Shore Harbour Capital Mgmt. Corp.*, No. 01-09-00417-CV, 2011 WL 862117, at *5 (Tex. App.—Houston [1st Dist.] Mar. 10, 2011, no pet.) (mem. op.) (holding that company president lacked specialized knowledge necessary to render prediction actionable). Statements promising future performance are actionable in fraud if the speaker has no intention of performing when he makes the statement. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors*, 960 S.W.2d 41, 48 (Tex. 1998).

An actionable statement is necessary to all of Allen's fraud claims.[9] *See Faircloth*, 898 S.W.2d at 276 (common law fraud); *Jericho Graphics Corp. v. Haynes*, No. 01-03-00987-CV, 2004 WL 2538677, at *3 (Tex. App.—Houston [1st

---

[9] An actionable statement is not necessary to Allen's fiduciary duty claims, which we do not address in this section. *See Fossier v. Morgan*, 474 S.W.2d 801, 803 (Tex. Civ. App.—Houston [1st Dist.] 1972, no writ); *Stokes v. Stokes*, 48 S.W.2d 724, 727 (Tex. Civ. App.—Eastland 1932, no writ).

Dist.] Nov. 10, 2004, no pet.) (mem. op.) (fraud under section 27.01); *Tex. Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 776 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (TSA); *Paull v. Capital Res. Mgmt.*, 987 S.W.2d 214, 218–19 (Tex. App.—Austin 1999, writ denied) (TSA). Likewise, when a fraud by non-disclosure claim is founded upon a statement by the defendant, the statement must be actionable; a non-actionable statement of opinion will not support a fraudulent non-disclosure claim.[10] *See Oliver v. Rogers*, 976 S.W.2d 792, 803–04 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (affirming summary judgment on claim that defendants had duty to disclose alleged intent not to perform arising after transaction closed, because promise of future performance is actionable only

---

[10] A fraud by non-disclosure claim may arise out of (1) a fiduciary relationship, which encompasses a broad duty of disclosure, or (2) a voluntary statement by the defendant, for which Texas courts of appeals have imposed specific, narrow duties of disclosure. *See JSC Neftegas-Impex v. Citibank, N.A.*, No. 01-07-00397-CV, 2011 WL 480931, at *16 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *Citizens Nat'l Bank v. Allen Rae Invs. Inc.*, 142 S.W.3d 459, 477 (Tex. App.—Fort Worth 2004, no pet.); *Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 212–13 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *see also* RESTATEMENT (SECOND) OF TORTS § 551 (1977); *but see Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) (noting that the Texas Supreme Court has never recognized duties of disclosure in § 551 of Restatement). Chief did not challenge the duty-to-disclose element of Allen's fraud claims—except in connection with the effect of the terms of the redemption agreement, which we address separately. We therefore assume, for purposes of this section, that Chief had a duty to disclose information rendering any of Rees-Jones's actionable statements misleading or incomplete. Our holding in this section precludes Allen from relying on specific non-disclosures—such as developments in drilling technology, Chief's expansion-area acquisitions, and achievements in expansion-area production—in his fraud claims only if and to the extent that the undisclosed information relates exclusively to a non-actionable statement. Our holding here does not affect Allen's fiduciary duty claims.

14

if there was no intent to perform at time of contracting); *Stephanz v. Laird*, 846 S.W.2d 895, 904 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (rejecting claim for failure to disclose information inconsistent with representation that, even if made, "would merely be opinion, in which case there would be no actionable fraud"); *Walton Pond Joint Venture v. Hiawatha Sav. & Loan Ass'n*, No. 01-88-00719-CV, 1990 WL 19083, at *9 (Tex. App.—Houston [1st Dist.] Mar. 1, 1990, writ denied) (not designated for publication) ("failure to disclose another development in the vicinity is not actionable as fraud here, because the only evidence on whether that project would indeed compete for the same market or was more easily marketed than the Walton Pond project was also a matter of opinion and speculation"); *cf. Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 478 (Tex. App.—Fort Worth 2004, no pet.) (holding that statements regarding frustration and loss of enthusiasm for franchisor were statements of fact, rather than opinion, and supported fraud by non-disclosure claim).

### 1. Actionable statements alleged by Allen

Allen asserts that eight statements in Rees-Jones's November 2003 letter are actionable, either because they are statements of fact or because they are statements of opinion that fall within exceptions to the general rule that statements

15

of opinion are not actionable in fraud.[11]

### a. Statements of fact

Allen contends that the following three statements from Rees-Jones's November 2003 letter are statements of fact, rather than opinion, and are therefore actionable. We address each statement in turn.

- "Chief now has approximately $400,000 per month of overhead, so making a profit of $5 million per year simply brings us to break even."

Allen contends that this is a statement of fact, and we agree. Chief's monthly overhead on the date of Rees-Jones's letter is a readily ascertainable fact.[12] We therefore hold that the trial court could not properly have granted summary judgment with respect to this statement on the ground that it is not actionable.

- "You should be aware that Chief's relationship with Mr. Bob Millard . . . has recently become very strained. Conflicts of a substantial nature have

---

[11] Allen pled oral representations by Rees-Jones, but the only statements on which he presents an "actionable" argument are those contained in Rees-Jones's letter. We therefore only consider whether the trial court's summary judgment on this ground should be reversed with respect to those written statements. To the extent Allen's brief frames his "duty to disclose" argument as an "actionable" argument, we have already recognized that Chief did not seek summary judgment on this ground and we therefore presume a duty to disclose with respect to any actionable statements.

The principal oral statement Allen attributes to Rees-Jones is a representation that the Phalon and Haas reports did not need updating. Even if we held this representation to be actionable, Allen's reliance on the statement would not be justifiable in light of the explicit terms of the redemption agreement, and his actual knowledge regarding changes in Chief's value would preclude a TSA claim.

[12] Rees-Jones expressly links the statement of overhead and profit to the time of the letter—i.e., "now."

16

developed that may result in protracted litigation that will be very expensive, with the outcome unknown at this time."

Allen contends that this is a statement of fact. Chief contends that it is a non-actionable statement of opinion. We hold that it is a mixed statement of fact and opinion: whether a strain in Chief's relationship with Mr. Millard actually existed is factual in nature, while Rees-Jones's assessment of the strain's severity and the risk of potential litigation are in the nature of an opinion. We therefore hold that Rees-Jones's representation as to the existence of a strain in Chief's relationship with Millard was actionable, and the trial court could not have properly granted summary judgment with respect to this representation on that basis.[13] Rees-Jones's representation as to the severity of the conflict and potential future litigation are non-actionable, and the trial court correctly granted summary judgment with respect to those representations on that basis.

- "Our first horizontal 'stepout' well . . . appears at this stage of completion to be a dry hole . . . . With respect to the 'expansion' area, the approximately dozen Barnett Shale wells on production . . . would show to be non-economic, indicating that further technological advancement needs to be made in order for the Barnett Shale in the 'expansion area' to become economic."

Allen contends that Rees-Jones's statements regarding Chief's dry hole, other companies' non-economic wells, and the need for technological advancement

---

[13] The parties do not appear to dispute that there was, in fact, a strain in Chief's relationship with Millard, resulting in litigation, but Chief did not seek summary judgment on the ground that it conclusively proved the truth of this statement.

are statements of fact, and are therefore actionable. Chief contends that these statements constitute non-actionable predictions. Focusing on the phrase "would show," Chief argues that the "conditional verb tense is future-oriented—in other words, a prediction." Chief further argues that fraud "rarely can be based on a prediction." Citing *Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, Chief asserts that oilfield projections for new fields—as opposed to mature fields with a meaningful production track record—are inherently non-actionable opinion. 249 S.W.3d 380, 385–86 (Tex. 2008). As Chief says, "*Everybody* knows that *nobody* knows future mineral prospects with any certainty" and therefore statements about future prospects of an unproven oilfield are not actionable "no matter how superior the knowledge of the speaker or how specific the predictions."

Allen's complaint, however, centers not on any alleged misrepresentation or non-disclosure relating to the reserves in the expansion area. Instead, Allen complains that Rees-Jones's pessimistic predictions about Chief's future prospects in the expansion area were largely predicated on two represented facts: the lack of success drilling in the expansion area and the absence of certain drilling technology essential to profitable production in the expansion area. According to Allen, those facts changed, Rees-Jones knew those facts changed, and Rees-Jones did not disclose the change to Allen.

Rees-Jones's representation that the drilling technology necessary to

18

successful production in the expansion area of the Barnett Shale did not exist is a statement of fact. Thus, even if we were to assume that Rees-Jones's statement that the wells in the expansion area of the Barnett Shale "would show to be non-economic" is a prediction, it is one that is "based on or buttressed with" his factual representation regarding the state of drilling technology and Chief's and other companies' experience on approximately a dozen expansion-area wells. *See Faircloth*, 898 S.W.2d at 276 (observing that opinion is actionable when based on or buttressed with false facts); *see also Trenholm*, 646 S.W.2d at 930 ("when an opinion is based on past or present facts, an action for fraud may be maintained"). We therefore hold that the trial court could not properly have granted summary judgment with respect to this statement on the ground that it is not actionable.

### b.     Statements of opinion

Allen concedes that the following five statements are statements of opinion but contends that Chief has not established as a matter of law that they are non-actionable opinions. Specifically, Allen contends that Chief failed to prove conclusively that Rees-Jones (1) did not have superior knowledge [14] or (2) actually

---

[14]     Chief argues that Allen had "equal access to knowledge" through publicly-filed documents and therefore Rees-Jones did not have superior knowledge. We do not reach this contention because we do not apply the superior knowledge exception to any of Rees-Jones's statements. To the extent Allen has asserted that a statement is actionable on the basis of Rees-Jones's superior knowledge, we have held the statement to be either (a) actionable under another exception or (b) not actionable on other grounds.

19

held the stated belief or intent at the time he made the statement. We address each statement in turn.

- "You should be aware that Chief will be taking a lot more risk moving forward from here. . . . I do not expect 'step-out' or 'expansion area' wells to carry anywhere near the value of the 'core area' wells, and the end result of this drilling could be a decline in the value of our company."

Allen contends that this opinion is actionable because (1) Chief has not conclusively proved that "Rees-Jones actually believed the expansion area posed any significant risk" and (2) Rees-Jones bolstered his opinion on this issue with factual statements about Chief's first expansion well and other developers' non-economic expansion-area wells. We agree that this statement is related to, and intertwined with, Rees-Jones's representations regarding the state of drilling technology and Chief's and other companies' expansion-area endeavors. *See Trenholm*, 646 S.W.2d at 931 (holding that representations of present facts were so intertwined with future prediction that whole statement amounted to factual representation). According to Allen, these interrelated representations, taken as a whole, amounted to a factual representation about the state of drilling technology and its effect on the profitability of drilling in the expansion area which, by the time of the June 2004 closing, was no longer accurate. Chief has not conclusively disproven these allegations. We therefore hold that the trial court could not properly have granted summary judgment with respect to this statement on the ground that it is not actionable.

20

- "I intend to work over the next ten years at a much more relaxed pace, perhaps taking a good bit of time off."

Allen contends that "[w]hether Rees-Jones really intended to slow down and take time off" is a matter of fact. Chief asserts that this is a statement of Rees-Jones's intent, and statements of intent to act or refrain from some act in the future are not actionable. *See Stone v. Enstam*, 541 S.W.2d 473, 480–81 (Tex. Civ. App.—Dallas 1976, no writ). But statements of intent are actionable if the speaker does not in fact have such an intent at the time. *See Formosa Plastics*, 960 S.W.2d at 48; *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 153 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *Stone*, 541 S.W.2d at 480–81. Chief, having the burden of proof, failed to offer evidence that Rees-Jones actually intended to work less in the coming years when he wrote this letter. *See Sci. Spectrum, Inc.*, 941 S.W.2d at 911. We therefore hold that the trial court could not properly have granted summary judgment with respect to this statement on the ground that it is not actionable.

- "I don't expect our growth to continue at this pace, which has been nothing short of phenomenal."

Allen contends that "[w]hether Rees-Jones truly expected Chief's growth rate to slow down or reverse" is a matter of fact. Chief contends that this statement is non-actionable opinion, and we agree. Predictions regarding the future profitability or value of a business enterprise are quintessential non-actionable

21

opinions. *See Sandefer*, 58 S.W.3d at 776 ("Statements of opinion, including opinions regarding value are generally not actionable under TSA."); *Paull*, 987 S.W.2d at 218–19 (holding that principal's guarantee that investment in company's waterflood project was "very low risk" and would fit investor's needs were non-actionable opinions); *Maness v. Reese*, 489 S.W.2d 660, 663 (Tex. Civ. App.—Beaumont 1972, writ ref'd n.r.e.) (holding that shareholder's statements regarding effect of redeeming shares on business were non-actionable opinions); *Fry v. Farm & Ranch Healthcare, Inc.*, No. 07-05-0221-CV, 2007 WL 4355055, at *3 (Tex. App.—Amarillo Dec. 13, 2007, no pet.) (mem. op.) ("Predictions and opinions regarding the future profitability of a business generally cannot form a basis for a claim of fraud."). Although predictions may be actionable if the speaker purports to have special knowledge of facts that will occur in the future, *see Trenholm*, 646 S.W.2d at 930, it is generally accepted that no one can predict future economic conditions or the behavior of the market with certainty. *See Lloyd v. Junkin*, 75 S.W.2d 712, 714 (Tex. Civ. App.—Dallas 1934, no writ) (holding that because "that which lies in the future cannot be a matter of certain knowledge," representations as to future value, productiveness, efficiency, or expected earnings or profits "must be taken and understood as mere expressions of opinion, and therefore their non-fulfillment cannot be treated as fraud"); *Garza v. C.L. Thomas Petroleum, Inc.*, No. 04-94-00374-CV, 1995 WL 522788, at *5 (Tex. App.—San

22

Antonio Sept. 6, 1995, writ denied) (not designated for publication) (holding that gasoline wholesaler's representations to retailer regarding future profits were non-actionable because profits depended on future economic conditions); *see also Zar v. Omni Indus., Inc.*, 813 F.2d 689, 693 (5th Cir. 1987) ("future predictions and opinions, especially those regarding the future profitability of a business, cannot form a basis for fraud as a matter of law"). Rees-Jones did not directly tie this prediction to a specific representation of existing fact, as he tied his statements about the profitability of expansion-area wells to the state of drilling technology. We hold that the trial court properly granted summary judgment with respect to this statement on the ground that it is not actionable.[15]

- "I frankly consider creating new value of $5 million per year consistently in the oil and gas business to be very difficult."

Allen contends that whether "Chief really had difficulty making a yearly profit of $5 million" is a matter of fact. But this statement is not about whether Chief in the past "had" difficulty creating value; it is a statement about whether Chief in the future will have difficulty creating *new* value. Additionally, Rees-Jones's assessment of how "difficult" he "consider[ed]" a task is a statement of opinion. It is thus a prediction and an opinion.

The opinion does not fall within any of the exceptions for actionable

---

[15]     Because this statement is non-actionable, it cannot create a duty to speak.

23

statements. It is not directly tied to any allegedly fraudulent statement of existing fact, is not a statement of intent, and does not promise future performance. Although Allen argues that Rees-Jones has "special knowledge of what was happening at Chief and in the Barnett Shale," the statement purports to convey only Rees-Jones's own assessment of the task's difficulty. *See Duperier v. Tex. State Bank*, 28 S.W.3d 740, 749 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.) (holding that broker's statement of assessment of safety and suitability of investment was non-actionable opinion). The difficulty of success in the oil and gas industry is not measured by Chief's success; where it succeeded, many others failed. Additionally, as noted above, predictions regarding the future profitability of a business enterprise are quintessential non-actionable opinions. We therefore hold that the trial court properly granted summary judgment with respect to this statement on the ground that it is not actionable.[16]

- "Having made the decision not to sell the company . . . ."[17]

Allen contends that "[w]hether Rees-Jones had truly decided not to sell the company" is a matter of fact. As noted above, statements of intent are actionable if the speaker does not in fact have such an intent at the time, and Chief failed to

---

[16]    Because this statement is non-actionable, it cannot create a duty to speak.

[17]    The introduction to the November 2003 letter likewise refers to Rees-Jones having made a "decision . . . to not sell the company."

24

present evidence that Rees-Jones did not intend to sell Chief to a third party when he wrote the letter. We therefore hold that the trial court could not properly have granted summary judgment with respect to this statement on the ground that it is not actionable.

### 3.    Conclusion

We hold that Chief failed to establish that the following statements are non-actionable as a matter of law:

- Chief now has approximately $400,000 per month of overhead, so making a profit of $5 million per year simply brings us to break even."

- "Our first horizontal 'stepout' well . . . appears at this stage of completion to be a dry hole . . . . With respect to the 'expansion' area, the approximately dozen Barnett Shale wells on production . . . would show to be non-economic, indicating that further technological advancement needs to be made in order for the Barnett Shale in the 'expansion area' to become economic."

- "I do not expect 'step-out' or 'expansion area' wells to carry anywhere near the value of the 'core area' wells, and the end result of this drilling could be a decline in the value of our company."

- "I intend to work over the next ten years at a much more relaxed pace, perhaps taking a good bit of time off."

- "You should be aware that Chief's relationship with Mr. Bob Millard . . . has recently become very strained. Conflicts of a substantial nature have developed that may result in protracted litigation that will be very expensive, with the outcome unknown at this time."

- Having made the decision not to sell the company . . . ."

But we hold that the trial court properly granted summary judgment with respect to

25

all other statements relied on by Allen as supporting a fraud claim.

**B.    Reliance**

Reliance is generally a necessary element of a fraud claim. *Schlumberger*, 959 S.W.2d at 181. Chief sought summary judgment on the ground that reliance was negated as a matter of law by (1) the terms of the redemption agreement and (2) Allen's knowledge of the changes in Chief's value between the redemption offer and its closing.

**1.    Contractual disclaimer of reliance**

Because reliance is essential to a fraudulent inducement claim, parties to an agreement can prevent a future claim that the agreement was fraudulently induced by including contract language clearly and unequivocally disclaiming reliance. *See Italian Cowboy*, 341 S.W.3d at 332–33; *see also Schlumberger*, 959 S.W.2d at 179–80. Chief asserts that the redemption agreement's "Finality" and "Independent Investigation" clauses amount to such a disclaimer of reliance. The "Finality" clause provides that the redemption agreement "is the complete and final integration" of the parties' undertakings and "supersedes all prior agreements and undertakings . . . between the parties with respect to the subject matter hereof." The "Independent Investigation" clause states that the redemption price was calculated and agreed to by the parties based on the Phalon appraisal and the Haas reserve report and recognizes that intervening events may have increased or

26

decreased the value of Allen's interest, that Allen had the opportunity to obtain any additional information about such intervening events necessary to permit him to evaluate the redemption offer, and that Allen had an opportunity to discuss and obtain answers regarding any information relating to the redemption from Chief, Phalon, Haas, and his own advisors and consultants.[18] In this clause, Allen

---

[18]  For context and greater detail, the paragraph reads as follows:

Independent Investigation. The Redemption Price has been calculated and agreed to by [Allen] and [Chief] on the basis of an appraisal by Phalon [] dated October 1, 2003 (the "Appraisal"), which in turn was based on a reserve report prepared by Haas Petroleum Engineering Services, Inc. dated October 1, 2003 (the "Reserve Report"). [Allen] acknowledges and agrees that he has received and read the Appraisal and the Reserve Report and has had the opportunity to obtain any additional information (including information concerning events occurring after the dates of the Appraisal and Reserve Report) necessary to permit him to evaluate the Company's proposal to acquire the Interest, and he has had an opportunity to discuss the Appraisal, the Reserve Report and such additional information with representatives of [Chief], the preparers of those reports and his own advisors and consultants and obtain answers to any questions that he may have had. [Allen] further acknowledges and agrees that the Appraisal and the Reserve Report are estimates of value and reserves only and could differ from the value and reserves that might be determined in some other context by some other appraiser, engineer or other party. [Allen] has based his decision to sell the Interest on (i) his own independent due diligence investigation, (ii) his own expertise and judgment, and (iii) the advice and counsel of his own legal, tax, economic, engineering, geological and geophysical advisors and consultants. Events subsequent to the dates of the Appraisal and Reserve Report may have a positive or negative impact on the value of the Interest but [Allen] and [Chief] agree that the redemption of the Interest shall be consummated at the Redemption Price in recognition of the fact that such price was the price on the basis of which [Allen] agreed to sell, [Chief] agreed to buy, and [Chief] agreed to undertake to raise the required capital to facilitate the Closing . . . . Therefore, the parties hereto agree that the Redemption Price [herein] shall be the price at which the Interest shall be redeemed regardless of any difference in opinion on

27

represents that he "has based his decision to sell" on (1) his own independent due diligence investigation, (2) his own expertise and judgment, and (3) the advice and counsel of his own advisors and consultants.

Allen responds that these provisions do not amount to a clear and unequivocal disclaimer of reliance and, even if they did, such a disclaimer would not be enforceable under *Forest Oil*. 268 S.W.3d at 60.

### a. Clear and unequivocal language

The threshold requirement for an effective disclaimer of reliance is that the contract language be "clear and unequivocal" in its expression of the parties' intent to disclaim reliance. *Italian Cowboy*, 341 S.W.3d at 331, 336, 337 n.8 (stating need "to protect parties from unintentionally waiving a claim for fraud," that clarity of the disclaimer is a "requirement" for its enforceability, and that only when disclaimer is "clear and unequivocal" does analysis "then proceed" to contract's circumstances); *see Schlumberger*, 959 S.W.2d at 179 (holding that disclaimer-of-reliance clause had "*requisite* clear and unequivocal expression of intent *necessary*

whether the Appraisal or Reserve Report are reflective of actual values or reserves and regardless of any change in value of the Interest that may occur subsequent to the dates of the Appraisal and Reserve Report, and each party hereby releases the other from any claims that might arise as a result of any determination that the value of the Interest at the Closing was more or less than the Redemption Price.

28

to disclaim reliance") (emphasis added).[19] In imposing this requirement, the Texas Supreme Court has balanced three competing concerns. First, a victim of fraud should not be able to surrender its fraud claims unintentionally. *See Italian Cowboy*, 341 S.W.3d at 332 (expressing "a clear desire to protect parties from unintentionally waiving a claim for fraud"); *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 238–39 (Tex. 1957) (stating that enforcing contracts that "contain[] somewhere within their four corners exculpatory clauses in one form or another" invalidating fraud claims "circumvent[s]" the policy protected by outlawing fraud and would open "the door to a multitude of frauds"); *see also Forest Oil*, 268 S.W.3d at 664 (Jefferson, J., dissenting) (stating that *Schlumberger* "balanced parties' need to settle disputes against our strong aversion to fraud"). Second, the law favors granting parties the freedom to contract knowing that courts will enforce their contracts' terms, as well as the ability to contractually resolve disputes between themselves fully and finally. *Italian Cowboy*, 341 S.W.3d at 332; *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007); *Forest Oil*, 268 S.W.3d at 58. Third, a party should not be permitted to claim fraud when he represented in the parties' contract that he did not rely on a representation:

---

[19] *Forest Oil* identified five factors as part of the totality of the circumstances courts consider in determining the validity of a contractual disclaimer: whether the disclaimer is "clear and unequivocal" and four extrinsic factors. 268 S.W.3d at 60–61. *Italian Cowboy* emphasized that this first factor is a "requirement" and therefore, if not satisfied, it is dispositive of the disclaimer's enforceability.

After-the-fact protests of misrepresentation are easily lodged, and parties who contractually promise not to rely on extra-contractual statements—*more than that, promise that they have in fact not relied upon such statements*—should be held to their word. Parties should not sign contracts while crossing their fingers behind their backs.

*Forest Oil*, 268 S.W.3d at 60.[20]

### i.     "Finality" clause

While the determination of whether a particular contract is sufficiently clear to disclaim reliance hinges on each contract's chosen words and structure, a "pure merger clause[]" is not sufficient. *Italian Cowboy*, 341 S.W.3d at 334 ("Pure merger clauses, without an expressed clear and unequivocal intent to disclaim

---

[20] Similar to the concerns expressed in *Forest Oil*, the Delaware Court of Chancery has stated that non-reliance clauses should generally be enforced because a contrary rule would countenance "a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside the contract's four corners." *Abry Partners V., L.P. v. F & W Acquisition L.L.C.*, 891 A.2d 1032, 1058 (Del. 2006). This has been described as "a 'double liar' scenario." *Id.*; *see also* Steven M. Haas, *Contracting Around Fraud Under Delaware Law*, 10 Del. L. Rev. 49, 52 (2008) (explaining that in double liar scenario "the plaintiff—who claims to be a victim of a lie—was itself a liar when it promised not to rely on the alleged misrepresentation."). Justice Easterbrook has identified two other rationales for enforcing anti-reliance clauses: (1) "it ensures that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication" and (2) anti-reliance clauses have economic value for market participants. *Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000); *see also Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 724 (7th Cir. 2008) (stating that anti-reliance clauses serve legitimate purpose because "a suit for fraud can be device for trying to get around limitations that the parol evidence rule and contract integration clauses place on efforts to vary a written contract on the basis of oral statements made in the negotiation phase"). Enforcement of clear anti-reliance clauses also "furthers the broader goal of certainty." Haas, 10 Del. L. Rev. at 69.

reliance or waive claims for fraudulent inducement, have never had the effect of precluding claims for fraudulent inducement"). The redemption agreement's "Finality" provision is such a pure merger clause.[21] *See* 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 33.21 (4th ed. 1999) ("Recitations to the effect that a written contract is integrated, that all conditions, promises, or representations are contained in the writing . . . are commonly known as merger or integration clauses."); *Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.*, 325 S.W.3d 692, 699 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). It makes no reference to reliance or fraudulent inducement, nor does it disavow oral representations between the parties. This generic merger provision does not amount to a clear and unequivocal expression of the parties' intent to disclaim reliance on each other's representations; it amounts to an expression of the parties' intent to merge prior negotiations into the final written agreement and supersede terms not ultimately incorporated into the final writing. *See Italian Cowboy*, 341 S.W.3d at 334 (holding that merger provision established that parties "intended nothing more than the provisions of a standard merger clause"); *see also Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 870

---

[21] The "Finality" clause states: "This Agreement is the complete and final integration of the undertakings of the parties hereto and supersedes all prior agreements and undertakings, whether oral or written, between the parties with respect to the subject matter hereof."

31

(Tex. App.—Austin 2006, pet. granted, jdmt vacated w.r.m.) ("A merger clause . . . memorializes the parties' intent to integrate or absorb their prior negotiations, agreements, or understandings concerning the same subject matter into a subsequent written contract."). Read in conjunction with the "Independent Investigation" clause, this provision does nothing to clarify or settle the parties' intentions regarding reliance.

### ii.    "Independent Investigation" clause

The "Independent Investigation" clause does not contain the kind of absolute and all-encompassing language that satisfies the clarity requirement as to any fraudulent inducement claim. *Cf. Forest Oil*, 268 S.W.3d at 58; *Schlumberger*, 959 S.W.2d at 180.[22] Nor does the statement that Allen's decision to sell was based on his own investigation clearly and unequivocally negate the possibility that Allen's decision was also based on information provided by Chief. Consistent with the terms of the redemption agreement, Allen could have relied on both. The clause in fact invites Allen to ask questions of Chief employees, implying that Allen not only could, but should, rely on information from Chief. To make it clear that Allen

---

[22]    In *Forest Oil*, the parties represented that "none of them is relying upon any statement or any representation of any agent of the parties" and "[e]ach of [them] is relying on his, her, or its own judgment and each has been represented by his, her, or its own legal counsel." 268 S.W.3d at 54 n.4. In *Schlumberger*, the parties represented that "none of us is relying upon any statement or representation of any agent of the parties" and "[e]ach of us  is relying on his or her own judgment and each has been represented by . . . legal counsel[.]" 959 S.W.2d at 180.

did not rely on any facts other than his own investigation, the disclaimer needed limiting language making it clear that Allen relied "only," "exclusively," or "solely" on his own investigation. *Cf. Matlock Place Apartments, L.P. v. Druce*, No. 02-09-00130-CR, 2012 WL 117838, at *13 (Tex. App.—Fort Worth 2012, no pet. h.) (enforcing disclaimer provision in which complaining party promised to rely "solely on its own investigation," along with other disclaimer language); *RAS Group, Inc. v. Rent-A-Ctr. E., Inc.*, 335 S.W.3d 630, 639 (Tex. App.—Dallas 2010, no pet.) (same); *but see Fazio v. Cypress/GR Houston I, L.P.*, No. 01-09-00728-CV, 2012 WL 159929, at *14 (Tex. App.—Houston [1st Dist.] Jan. 19, 2012, no. pet. h.) (holding that party's promise to rely "solely" on his own investigation was not effective to disclaim reliance with respect to non-disclosure of information that other party had contractual obligation to provide). Or, the clause could include a broad and absolute abjuration of reliance on any oral representations by any other party, as was the case in *Forest Oil* and *Schlumberger*. *Forest Oil*, 268 S.W.3d at 54 n.4; *Schlumberger*, 959 S.W.2d at 180. The omission of language limiting Allen's reliance to his own investigation exclusively and the absence of a promise not to rely on any statement or representation by Chief are fatal to Chief's global disclaimer of reliance argument.

Chief further contends that a refusal to enforce this clause "prevents parties from contractually agreeing" to bar future fraud claims. Not so. The redemption

agreement lacks a number of provisions that would provide greater clarity. It lacks: (1) an all-embracing disclaimer that Allen had not relied on any representations or omissions by Chief; (2) a specific "no liability" clause stating that the party providing certain information will not be liable for any other person's use of the information; and (3) a specific waiver of any claim for fraudulent inducement based on misrepresentations or omissions.[23] *See Italian Cowboy*, 341 S.W.3d at 334 (concluding that merger clause did not include "an expressed clear and unequivocal intent to disclaim reliance or waive claims for fraudulent inducement"); *Forest Oil*, 268 S.W.3d at 58 (stating that "an all-embracing disclaimer of any and all representations . . . shows the parties' clear intent"); *Schlumberger*, 959 S.W.2d at 181 ("a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement"); *see also Coastal Bank SSB v. Chase Bank of Tex., N.A.*, 135 S.W.3d 840, 843 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (finding that "the nature of the disclaimers" demonstrated that plaintiff could not rely on other party's representation or silence when disclaimers stated that plaintiff had not

---

[23]   A clause that specifically waives any claim for fraud is more clear than an independent investigation or anti-reliance clause because while the purpose of an anti-reliance clause "is to head off a suit for fraud," such a clause "doesn't say that; it uses the anodyne term 'reliance,'" the significance of which may not be understood by the buyer. *Extra Equipamentos E Exportacao*, 541 F.3d at 724.

relied on defendant's representations and that defendant would not have any liability "for any representations . . . or for any omissions"). The redemption agreement does none of these.[24]

The "Independent Investigation" clause does, however, embody a clear and unequivocal intent to bar *some* reliance by Allen: it clearly disclaims reliance on representations concerning the redemption price, the bases for that price (the Phalon appraisal and the Haas reserve report), and whether those documents accurately reflected the value of Chief or its assets.

### iii.    Application of disclaimer to actionable statements

We next apply the redemption agreement's limited disclaimer of reliance to each of the actionable statements asserted by Allen.

- "Our first horizontal 'stepout' well . . . appears at this stage of completion to be a dry hole . . . . With respect to the 'expansion' area, the approximately dozen Barnett Shale wells on production . . . would show to be non-economic, indicating that further technological advancement needs to be made in order for the Barnett Shale in the 'expansion area' to become economic."

- "I do not expect 'step-out' or 'expansion area' wells to carry anywhere near the value of the 'core area' wells, and the end result of this drilling could be a decline in the value of our company."

---

[24]    We offer these merely for illustrative purposes. We do not hold that any particular words must be stated in order for a disclaimer to preclude a fraudulent inducement claim or that each one of these issues must be addressed in every disclaimer.

Chief contends that these statements go to the value of Chief and its assets, an issue on which Allen has clearly disclaimed reliance. Allen responds that his complaint is not that the redemption price did not represent the true value of his shares but that he would not have sold his interest in June 2004 if he had known all material facts about Chief's future prospects, such as the state of the relevant drilling technology and the status of competitors' expansion-area ventures.

To the extent these statements relate exclusively to Chief's value, we agree with Chief that the redemption agreement expressly negates any reliance by Allen. Such reliance is disclaimed by (1) Allen's recognition that

> [e]vents subsequent to the dates of the Appraisal and Reserve Report may have a positive or negative impact on the value of the Interest but [Allen] and [Chief] agree that the redemption of the Interest shall be consummated at the Redemption Price in recognition of the fact that such price was the price on the basis of which [Allen] agreed to sell, [Chief] agreed to buy, and [Chief] agreed to undertake to raise the required capital to facilitate the Closing"

and (2) his contractual promise that

> the Redemption Price [herein] shall be the price at which the Interest shall be redeemed regardless of any difference in opinion on whether the Appraisal or Reserve Report are reflective of actual values or reserves and regardless of any change in value of the Interest that may occur subsequent to the dates of the Appraisal and Reserve Report, and each party hereby releases the other from any claims that might arise as a result of any determination that the value of the Interest at the Closing was more or less than the Redemption Price.

See McLernon v. Dynegy, Inc., 347 S.W.3d 315, 331–32 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (holding that employee's reliance on alleged

misrepresentation that other executives had signed similar agreements was barred by contract provision in which employee represented that he had not relied on any representations regarding agreement); *see also Schlumberger*, 959 S.W.2d at 181.

But we have held that these statements are actionable because they are buttressed by or intertwined with Rees-Jones's representations regarding the state of drilling technology and Chief's and other companies' expansion-area endeavors. The redemption agreement does not address these existing facts, which Allen asserts are material not only to Chief's value at the time of the redemption and the price at which he was willing to redeem in 2004, but also to Chief's future prospects and whether 2004 was the right time to redeem his interest. Chief did not conclusively prove that these issues would not have been material to a reasonable investor's decision of whether to redeem his interest.[25] Thus, we hold that the

---

[25] Chief contends on appeal that Allen is "[s]eeking to wordsmith around the explicit terms of his release" by contending that "the facts on which he now bases his fraud claim are not facts that would have affected the value of Chief." Allen responds that a reasonable investor may decide whether to sell based not only on the price but on the company's future prospects. We agree with Allen. We do not think it is axiomatic that a reasonable investor will always sell an investment upon receipt of an offer of its fair market value. If that were true, investors of publicly-traded stock would never hold onto a stock in anticipation of future growth because the public market generally provides a willing buyer who will pay the stock's fair market value. A reasonable investor may consider the totality of the circumstances in deciding whether to sell an investment, including whether the offer reflects the investment's value as well the investor's personal financial position and risk tolerance, the company and management's past performance, any anticipated changes in management, the company's future business prospects, and general economic conditions. The price a reasonable investor will accept for the sale of stock may turn on the market, but the decision of whether to sell may not.

redemption agreement clearly and unequivocally disclaims reliance on Rees-Jones's representations to the extent they convey information about Chief's value and the suitability of the redemption price, but it does not clearly and unambiguously disclaim reliance on Rees-Jones's representations to the extent they convey information about Chief's future prospects in light of the state of drilling technology and Chief's and other companies' expansion-area endeavors.

- Chief now has approximately $400,000 per month of overhead, so making a profit of $5 million per year simply brings us to break even."

- "I intend to work over the next ten years at a much more relaxed pace"

- "You should be aware that Chief's relationship with Mr. Bob Millard . . . has recently become very strained. Conflicts of a substantial nature have developed that may result in protracted litigation that will be very expensive, with the outcome unknown at this time."

- "Having made the decision not to sell the company . . . ."

The redemption agreement does not broadly disclaim reliance on any statements by Rees-Jones and it does not specifically address Chief's overhead and profits, Rees-Jones's work habits, Chief's relationship with Millard, or Rees-Jones's decision not to sell Chief to outside investors. It therefore does not clearly and unequivocally disclaim reliance on these statements.

### b. Remaining *Forest Oil* factors

The clarity requirement is a threshold hurdle that must be passed for a disclaimer to be enforceable; when the disclaimer lacks a clear and unequivocal

38

expression of intent to disclaim reliance, it will not preclude a fraudulent inducement claim regardless of the circumstances surrounding the agreement. *Italian Cowboy*, 341 S.W.3d at 331, 336, 337 n.8. Because we have concluded that the redemption agreement does not clearly and unequivocally disclaim reliance with respect to Rees-Jones's representations about Chief's overhead and relationship with Millard, Rees-Jones's future work habits, drilling technology, or Chief and other companies' expansion-area endeavors, the redemption agreement does not bar Allen's fraudulent inducement claim with respect to those statements as a matter of law. Because we have concluded that the redemption agreement is sufficiently clear and unequivocal to bar Allen's reliance on Rees-Jones's representation with respect to the value of Chief and its assets or the redemption price, we must look to the remaining *Forest Oil* factors to determine whether the redemption agreement's disclaimer of such reliance is enforceable.

### i. Three of the five *Forest Oil* factors favor enforcement

The *Forest Oil* Court identified four extrinsic factors that courts must consider in evaluating the validity of a contractual disclaimer of reliance: whether (1) the terms of the contract were negotiated or boilerplate, (2) the complaining party was represented by counsel, (3) the parties dealt with each other at arm's length, and (4) the parties were knowledgeable in business matters. *Forest Oil*, 268

S.W.3d at 60–61; *see Schlumberger*, 959 S.W.2d at 179–81.[26]

The second and fourth factors weigh in favor of Chief. Allen is an attorney who specializes in oil and gas transactions and represented himself in the sale of his interest to Chief. Allen even offered to represent Chief in the sale of the company two years after the redemption. An attorney who represents himself in a legal matter in which he has particular expertise cannot claim in hindsight to lack the benefit of counsel. As an oil and gas attorney, Allen was also knowledgeable in business matters specific to the oil and gas industry. Thus, in our consideration of the second and fourth factors, we cannot say that Allen lacked representation or was not sophisticated and knowledgeable about oil and gas transactions.

With respect to the third factor, Allen argues that "securities transactions are never arm's length when a company is buying a shareholder's stock." Allen, however, does not cite any supporting authority for this broad proposition except for a case involving fiduciary relationships. In the absence of such authority, we reject this wide-sweeping rule. But Allen's uncontroverted evidence demonstrated that he relied heavily on Rees-Jones for advice on his investment and acted as a

---

[26] *Italian Cowboy* does not answer whether the clarity "factor" (*Forest Oil*'s term) or "requirement" (*Italian Cowboy*'s term) remains part of the "totality of the circumstances" that is examined in determining a disclaimer's enforceability. *Forest Oil*, 268 S.W.2d at 60 (holding that court must examine the totality of the circumstances"). Because a "totality of the circumstances" test by definition examines all the circumstances, we conclude that clarity requirement is also a factor for determining the enforceability of a disclaimer that is sufficiently clear.

40

passive investor, and Rees-Jones exercised control over Chief's daily affairs.[27]

Additionally, we determine below that Chief has not negated Allen's claim that Rees-Jones owed him a formal fiduciary duty in this transaction.[28] Chief has not shown that this factor weighs in its favor.

Chief has also not shown that the first factor—whether the parties negotiated the terms of the redemption agreement—weighs in its favor. Allen states in his affidavit that Rees-Jones gave him only three days to review and sign the redemption agreement after receiving it. Chief responds that Allen negotiated the agreement because he asked if the valuation needed to be updated. Allen, however, offered evidence that he relied on Rees-Jones's oral representation that a new valuation "was not necessary." Chief provided no other evidence to show that the

---

[27] Allen presented evidence that he and Rees-Jones were personal friends for over twenty years before the redemption and that he had invested in Rees-Jones's oil and gas ventures for more than fifteen years. According to Allen's affidavit, Rees-Jones "asked me to place my 'confidence and trust' in him" when he offered Allen an ownership interest in Chief. In a letter, Rees-Jones described each of the original investors in Chief as "long-time friends." Allen also testified that they had a "close" and "long-term" relationship and that he had attended Rees-Jones's wedding. Allen stated that Rees-Jones "encouraged" him to place his trust and confidence in Rees-Jones in making and protecting various investments over the course of their relationship. In his deposition, Allen testified that he subjectively relied on Rees-Jones, had invested in several of Rees-Jones's projects, and was "conditioned" to trust Rees-Jones.

[28] A transaction between a fiduciary and the party to whom the fiduciary duty is owed is not conducted at arm's length; rather, a heightened standard applies to the fiduciary's part of the transaction. *See S.V. v. R.V.*, 933 S.W.2d 1, 34 (Tex. 1996); *Arce v. Burrow*, 958 S.W.2d 239, 246 (Tex. App.—Houston [14th Dist.] 1997), *aff'd in part, rev'd in part on other grounds,* 997 S.W.2d 229 (Tex. 1999).

41

contract was negotiated. Additionally, despite Chief's argument that the "Independent Investigation" clause "make[s] up the core of the agreement," there is no summary judgment evidence that the parties expressly negotiated the "Independent Investigation" clause, that Rees-Jones informed Allen of the clause's importance, or that Rees-Jones stressed the importance of Allen reviewing information available from Chief. *Cf. Forest Oil*, 268 S.W.3d at 60 (identifying the consideration as whether "the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute"); *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995) (noting that clause was important part of basis of bargain).

In sum, we conclude that Chief established only the second and fourth extrinsic factors from *Forest Oil*. We next determine whether these factors are sufficient to establish the disclaimer's enforceability with respect to those representations that we have found were clearly and unequivocally disclaimed.

### ii.     A disclaimer is not enforceable when only these three *Forest Oil* factors are present

All four extrinsic factors were satisfied in *Forest Oil* and *Schlumberger*. *Forest Oil*, 268 S.W.3d at 60; *Schlumberger*, 959 S.W.2d at 179–80. The *Forest Oil* Court described these four factual inquiries as "factors," suggesting that they are not absolute requirements. *Forest Oil*, 268 S.W.3d at 60. And this Court has

previously held that an agreement between two parties barred fraud claims as a matter of law even when all of the *Forest Oil* factors were not present. *See Atlantic Lloyds Ins. Co. v. Butler*, 137 S.W.3d 199, 216–17 (Tex. App.—Houston [1st Dist.] 2004, pet denied) (holding disclaimer of reliance barred fraudulent inducement claim when all factors later identified in *Forest Oil* were satisfied except sophistication of parties); *see also McLernon*, 347 S.W.3d at 333 (noting that *Forest Oil* considerations are "'facts . . . that guide[ ] our reasoning' and 'factors'—not elements that all must be established") (quoting *Forest Oil*, 268 S.W.3d at 60). Therefore, it is unnecessary to satisfy each factor when the parties' intent to preclude a fraud claim is clear and unequivocal and a sufficient number of factors are satisfied to meet the public policy concerns expressed in *Schlumberger* and its progeny.

But which factors must be satisfied and how are we to weigh the factors? Or more precisely here, is it sufficient that this is a commercial transaction between sophisticated parties represented by counsel with a disclaimer that, at least in some respects, is clear? Neither *Forest Oil* nor *Schlumberger* answers these questions. We hold that the totality of the circumstances does not support enforcing the disclaimer when the only factors that are present are clarity, sophistication, and representation by counsel because all three focus on the public policy concern that the party may be unable to understand the terms of the disclaimer but not the

concern that the party may be unable to alter the terms of the disclaimer. *Cf. Forest Oil*, 268 S.W.3d at 58 (enforcing "freely negotiated" agreement to bar claims); *Schlumberger*, 959 S.W.2d at 179 (stating that parties should be able to "bargain for" agreement that precludes further disputes between them). Something more is required—either negotiated terms or an arm's length transaction—both of which focus on the party's ability to alter the disclaimer's terms so that a party voluntarily surrenders its rights to a fraud claim.[29] One of these two factors can be satisfied by demonstrating that the party who agrees to the disclaimer either (1) did in fact negotiate the contract terms or (2) had the ability to negotiate terms because the parties dealt with each other at arm's length.[30] *See Kane v. Nxcess Motorcars, Inc.*, No. 01-04-00547-CV, 2005 WL 497484, at *6 (Tex. App.—Houston [1st Dist.]

---

[29] We resist finding the disclaimer effective merely because the majority of the factors weigh in Chief's favor. Courts must guard against becoming so preoccupied with analyzing the number or details of the individual factors that they lose focus on the essential question the factors are an aid in resolving. In this case, the five factors suggest at least two broad areas of inquiry must be met, areas of inquiry that are based in part on the concerns that courts balance in creating these factors.

[30] For similar reasons, bargaining power or actual bargaining has been required for waivers of fraud under the DTPA and for waivers of jury trials. *See* TEX. BUS. & COM. CODE ANN. § 17.42 (West 2011) (providing that written waiver of remedies is enforceable only when plaintiff does not have significantly less bargaining power than other party); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 132 (Tex. 2004) (stating that contractual jury waivers are not enforceable if they are obtained by party taking unfair advantage of others or using its "bargaining position, sophistication, or other leverage to extract waivers from the reluctant or unwitting"); *see also Abry Partners*, 891 A.2d at 1056 (enforcing disclaimers of reliance when contract is "the product of give-and-take between commercial parties who have the ability to walk away freely").

Mar. 3, 2005, no pet.) (mem. op.) (reviewing enforceability of "as is" clause in pre-*Forest Oil* case based in part on whether parties had "disparity in bargaining power" and whether agreement was "freely negotiated").

Considering the cases that provided the foundation for the *Forest Oil* factors supports our conclusion that it is insufficient to establish only that the parties are sophisticated and represented by counsel. In *Jefferson Associates*, the Court held that an "as is" clause will be enforceable only in an arm's-length transaction involving sophisticated parties who are in "relatively equal bargaining position." 896 S.W.2d at 162. Additionally, the Court stressed that when the parties engage in negotiations over the contract's terms, the provision in question is "an important part of the basis of the bargain." *Id.* In *Schlumberger*, the Court stated that it is not enough for a sophisticated party to be represented by counsel; the parties in that case also negotiated at arm's-length. 959 S.W.2d at 180.[31]

We hold that, although the redemption agreement is sufficiently clear and unequivocal to disclaim Allen's reliance with respect to Rees-Jones's representations about the value of Chief and its wells, the disclaimer is not enforceable because the totality of the circumstances surrounding the redemption

---

[31] We therefore cannot agree with Chief's contention that Allen's expertise and sophistication make the redemption agreement an arm's length transaction as a matter of law. That interpretation would cause the arm's length transaction requirement to collapse into and be redundant of the sophistication factor.

agreement do not satisfy the test set forth in *Forest Oil* for disclaimers of reliance.

### 2. Justifiable reliance

Allen contends that "reliance is not an element of fraud by omission," and even if it were, Chief did not conclusively negate reliance. Chief asserts that reliance is a necessary element of all fraud claims, it must be actual and justifiable, and the facts of this case make any alleged reliance by Allen unjustifiable.

### a. Justifiable reliance is not an element of Allen's TSA claim but is an element of his other fraud claims

In *Schlumberger*, the Texas Supreme Court rejected an argument that reliance is not an element of fraud by omission. *Schlumberger*, 959 S.W.2d at 181 (rejecting argument in context of fraud claims under common law and Business and Commerce Code); *see also PAS, Inc. v. Engel*, 350 S.W.3d 602, 612 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (stating that justifiable reliance is element of both common law fraud and fraudulent inducement). In *Grant Thornton L.L.P., v. Prospect High Income Fund*, the Court reiterated that reliance must be both actual and justifiable to support a fraud claim. 314 S.W.3d 913, 923 (Tex. 2010). Thus, justifiable reliance is a necessary element of Allen's claims for common law fraud and statutory fraud under the Business and Commerce Code. *See Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997) (stating that plaintiff claiming fraud by non-disclosure "must have reasonably relied upon the silence to his detriment").

46

Reliance is not, on the other hand, a necessary element of Allen's fraud claim under the TSA.[32] *See* TEX. REV. CIV. STAT. ANN. art. 581-33B (West 2010); *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 234 (Tex. App.—Houston [1st Dist.] 1996, no writ) (stating that TSA does not require proof of reliance).

### b. Chief did not prove Allen's reliance was unjustified

Chief contends that Allen's reliance is not justifiable because Allen admitted that, at the time of the redemption, he believed (1) "Chief had increased in value between November and June by at least 50% from the Phalon valuation," and (2) "Rees-Jones was committing securities fraud by not re-valuing his interest and updating him on the increase in value." Chief also points to the language of the redemption agreement and a 2005 email in which Allen stated that the value of his interest in Chief had been established by the October 2003 valuation, but "the closing didn't take place until 8 months later. We knew that the value of the enterprise would be significantly greater then, but in light of the home run the investment had been, chose not to raise the issue."[33] Allen responds that a fact

---

[32]    Nor is reliance an element of Allen's fiduciary claims. *PAS*, 350 S.W.3d at 610.

[33]    Chief also asserts that the redemption agreement imposed a "duty to investigate" on Allen, that Allen is therefore charged with all knowledge that would have been revealed in a "reasonably thorough review" of Chief's records and personnel, and that Allen's reliance is unjustified in light of this access to information. Chief's summary judgment argument on reliance contains a single reference to this issue: "Allen admitted he had unfettered access to Chief personnel and any questions he might have about Chief." Chief did not identify, or cite to evidence of, what information Allen would have discovered in a "reasonably thorough review."

47

issue exists on justifiable reliance because he "presented uncontroverted evidence that he sold his interest in Chief in reliance upon Rees-Jones's representations, omissions, and advice, and that if he had known the truth about what was happening at Chief and in the non-core area of the Barnett Shale, he would not have sold his interest."

The issue of justifiable reliance is generally a question of fact. *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 584 (Tex. App.—San Antonio 2011, no pet.); *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 30 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). The issue becomes a question of law, however, when the undisputed or conclusively proven facts demonstrate circumstances under which reliance cannot be justified. For example, a party's reliance on a representation is not justified when the party has actual knowledge of the representation's falsity at the time of alleged reliance. *E.g.*, *JSC Neftegas-Impex v. Citibank, N.A.*, No. 01-07-00397-CV, 2011 WL 480931, at *15–16 (Tex. App.—Houston [1st Dist.] Feb. 10, 2011, pet. denied) (op. on reh'g). Additionally, a party cannot justifiably rely on a statement that directly contradictors the express terms of the parties' written agreement. *DeClaire*

---

On appeal, Chief also contends that information available to Allen through public records bars Allen's TSA claims. In its summary judgment motion, Chief argued that the same information negated any justifiable reliance. We reject both contentions for the reasons discussed in the TSA section below.

*v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 46–47 (Tex. App.—

Houston [1st Dist.] 2008, no pet.); *DRC Parts & Accessories, L.L.C. v. VM Motori,

S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

As we did with disclaimer of reliance, we must look at the parties' justifiable

reliance arguments in the context of the remaining representations identified by

Allen that we have held to be actionable, if proven fraudulent.

- "Our first horizontal 'stepout' well . . . appears at this stage of completion to be a dry hole . . . . With respect to the 'expansion' area, the approximately dozen Barnett Shale wells on production . . . would show to be non-economic, indicating that further technological advancement needs to be made in order for the  Barnett Shale in the 'expansion area' to become economic."

- "I do not expect 'step-out' or 'expansion area' wells to carry anywhere near the value of the 'core area' wells, and the end result of this drilling could be a decline in the value of our company."

Allen's knowledge regarding the change in Chief's value from October 2003

to June 2004 has an import similar to that of the disclaimer language—with this

knowledge, Allen could not have justifiably relied on these statements in assessing

Chief's value or the redemption price.[34] But Chief has not conclusively established

---

[34] Chief also contends that Allen's reliance on these statements is unjustified in light of the express language of the redemption agreement, relying on the disclaimer provisions addressed above. *See JSC Neftegas-Impex*, 2011 WL 480931, at *15–16; *DeClaire*, 260 S.W.3d at 46–48; *DRC Parts*, 112 S.W.3d at 858–59. We reject Chief's reliance on the disclaimer provisions because we have held that the disclaimer is unenforceable under *Forest Oil*. To the extent Chief relies on *Declaire* and *DRC Parts* to avoid the burden of *Forest Oil*'s enforceability test, that reliance is misplaced. Those cases address express conctract terms that were

that Allen had knowledge that prevented him from justifiably relying on these statements in assessing Chief's future prospects in light of the state of drilling technology and Chief's and other companies' drilling ventures.

- Chief now has approximately $400,000 per month of overhead, so making a profit of $5 million per year simply brings us to break even."

- "I intend to work over the next ten years at a much more relaxed pace, perhaps taking a good bit of time off."

- "You should be aware that Chief's relationship with Mr. Bob Millard . . . has recently become very strained. Conflicts of a substantial nature have developed that may result in protracted litigation that will be very expensive, with the outcome unknown at this time."

- "Having made the decision not to sell the company . . . ."

The knowledge Chief attributes to Allen has no bearing on the amount of Chief's overhead or revenue necessary to "break even," Rees-Jones's future work habits, Chief's relationship with Millard, or Rees-Jones's intentions for selling Chief. Chief therefore failed to prove that Allen did not justifiably rely on these statements as a matter of law.

---

not part of disclaimer or release provisions. *DeClaire*, 260 S.W.3d at 47–48 (holding that party could not avoid "sole recourse" language in contract on basis of alleged prior oral agreement); *DRC Parts*, 112 S.W.3d at 858–59 (holding that party could not assert that he was fraudulently induced to enter contract by oral representation that contract would be "exclusive" when contract expressly stated that it was non-exclusive); *cf. Forest Oil*, 268 S.W.3d at 58–60 (applying test to language in release and disclaimer clauses that contradicted allegations of oral representations); *Matlock Place Apartments*, 2012 WL 117838, at *12–13 (same); *McLernon*, 347 S.W.3d at 330–33 (same). A disclaimer that is unenforceable under *Forest Oil* does not nevertheless bar justifiable reliance—otherwise, the enforceability test would serve no purpose.

### 3.      Conclusion on reliance

We hold that Chief conclusively proved that Allen could not have justifiably relied on Rees-Jones's statements regarding expansion-area drilling to the extent those representations purportedly conveyed information about Chief's value or the redemption price, and the trial court's judgment is proper in that respect. Chief did not, however, conclusively prove that Allen could not have justifiably relied on these statements to the extent they conveyed information about the state of drilling technology and Chief's and other companies' expansion-area ventures; nor did Chief conclusively prove that Allen could not have justifiably relied on any of Rees-Jones's other actionable statements. We therefore hold that the trial court erred to the extent it relied on a lack of reliance in granting summary judgment on Allen's fraud claims based on those statements.

### Fiduciary Duty

Rees-Jones moved for summary judgment on Allen's breach of fiduciary duty claim on the ground that Allen could not show the existence of a fiduciary relationship. *See Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005) (discussing existence of fiduciary relationship as element of fiduciary duty claim); *Gregan v. Kelly*, 355 S.W.3d 223, 227–28 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (same). Allen contends that the trial court erred in granting summary judgment on his breach of fiduciary duty claim because formal and informal

fiduciary relationships existed. We hold that Rees-Jones failed to establish conclusively that he did not owe Allen a formal fiduciary duty in connection with the redemption, and, therefore, do not reach the issue of whether an informal fiduciary relationship may have existed. *See* TEX. R. APP. P. 47.1.

## A. Formal Fiduciary Relationship

The special nature of certain types of relationships establishes a fiduciary duty between the parties as a matter of law. *E.g.*, *Envtl. Procedures*, 282 S.W.3d at 628 (observing that, when a formal fiduciary relationship exists, "questions of whether one party relied on or confided in the other are immaterial"). Examples include attorney-client, principal-agent, and partnership relationships. *Gregan*, 335 S.W.3d at 227–28. Chief was a closely-held limited liability company (LLC), and Rees-Jones was its sole manager and majority owner. Allen asserts that Texas law recognizes two formal fiduciary duties owed by Rees-Jones: (1) one owed by a majority shareholder who dominates control over the business to minority shareholders and (2) one owed by a closely-held company's officers and shareholders to a shareholder who is redeeming stock.

### 1. Texas law does not recognize a general fiduciary duty between majority and minority shareholders in a closely-held corporation

Chief was an LLC, not a corporation. Nevertheless, we begin by looking at cases involving closely-held corporations because Allen relies on these cases and

52

Chief, as a closely-held LLC, operated much like a closely-held corporation.[35]

Neither the Texas Supreme Court nor this Court has addressed whether a majority shareholder in a closely-held corporation owes a fiduciary duty to a minority shareholder in a redemption of shares. *See generally Willis v. Donnelly*, 199 S.W.3d 262, 277 (Tex. 2006) (declining to decide and assuming that fiduciary duty can exist from majority shareholder to minority shareholder in claim arising out of majority shareholder's loan to corporation). Many courts in other jurisdictions have recognized a fiduciary duty by a majority shareholder in a closely-held corporation to a minority shareholder in the context of a stock redemption,[36] while others have

---

[35]  Texas law applies the same qualifications for closely-held status to both corporations and LLCs. *Compare* TEX. BUS. ORGS. CODE ANN. § 101.463(a) (defining closely-held LLC as LLC with fewer than 35 members that has no membership interests listed on national securities exchange or regularly quoted in over-the-counter market), *with id.* § 21.563 (defining closely-held corporation as corporation with fewer than 35 shareholders that has no shares listed on national securities exchange or regularly quoted in over-the-counter market).

[36]  *D & J Tire, Inc. v. Hercules Tire & Rubber Co.*, 598 F.3d 200, 206 (5th Cir. 2010) (concluding that directors and officers owe minority shareholders fiduciary duties when acquiring stock on corporation's behalf); *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1001 (N.Y. 2011) (noting that majority shareholder in closely-held LLC owed fiduciary duty of full disclosure to minority shareholders in context of sale of interest and release); *Salm v. Feldstein*, 799 N.Y.S.2d 104, 105 (N.Y. App. Div. 2005) (stating that managing member of LLC owed fiduciary duty of full disclosure to other member in purchase of member's interest); *Lazenby v. Godwin*, 253 S.E.2d 489 (N.C. Ct. App. 1979) (holding that "special circumstances" existed to establish fact question on whether fiduciary duty was owed by president, manager, and majority shareholder of corporation to minority shareholders in purchasing minority shareholders' shares when minority shareholders did not have equal access to information); *Donahue v. Rodd Electrotype Co.*, 328 N.E.2d 505, 592–93 & n.17 (Mass. 1975) (holding that "stockholders in the close corporation owe one another substantially the same

53

recognized it more generally, even outside the context of a redemption.[37] They have done so partly based on the rationale that shareholders in a closely-held corporation "are more realistically viewed as partners" and therefore "owe each other duties analogous to partners in a partnership."[38] Additionally, some courts have focused on the majority shareholder's domination or control of the corporation's affairs, which is ameliorated by the protections created by fiduciary duties.[39] Others have focused on the majority shareholder's access to insider

fiduciary duty in the operation of the enterprise that partners owe to one another" in context of dispute over corporation's repurchase of shares); *see also Hollis v. Hill*, 232 F.3d 460, 468 (5th Cir. 2000) (noting that *Donahue*'s "recognition of special rules of fiduciary duty applicable to close corporations has gained widespread acceptance"); *but see Adelson v. Adelson*, 806 N.E.2d 108, 120 (Mass. App. Ct. 2004) (holding that fiduciary duty between shareholders imposed by *Donahue* is limited to matters of corporate governance and does not extend to majority shareholder's purchase of minority shareholder's stock).

[37] *See Fiederlein v. Boutselis*, 952 N.E.2d 847, 860 (Ind. Ct. App. 2011); *U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 381 (Minn. 2011); *McLaughlin v. Schenck*, 220 P.3d 146, 155 (Utah 2009); *Walta v. Gallegos Law Firm, P.C.*, 40 P.3d 449, 456–57 (N.M. 2001).

[38] *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 236, 241 (Ind. 2001); *see also Pointer v. Castellani*, 918 N.E.2d 805, 808 (Mass. 2009); *Patmon v. Hobbs*, 280 S.W.3d 589, 594 (Ky. Ct. App. 2009); *Purcell v. S. Hills Invs., LLC*, 847 N.E.2d 991, 996–97 (Ind. Ct. App. 2006); *Walta*, 40 P.3d at 456–57; *Crosby v. Beam*, 548 N.E.2d 217, 220 (Ohio 1989); *Donahue*, 328 N.E.2d at 592–93 & n.17; *see generally Johnson v. Peckham*, 132 Tex. 148, 151, 120 S.W.2d 786, 787 (1938) (recognizing duty of full disclosure when one partner sells his interest to another).

[39] *See McLaughlin*, 220 P.3d at 156 (noting, as one justification for imposing fiduciary duty on majority shareholders in closely-held corporation, increased likelihood that majority shareholders control board of directors); *Tully v. McLean*, 948 N.E.2d 714, 740 (Ill. App. Ct. 2011) ("[t]he essence of a fiduciary relationship is that one party is dominated by another; the presence of a significant degree of

information.[40] But many other courts have refused to recognize a fiduciary duty from a majority shareholder to a minority shareholder in a closely-held corporation.[41]

In the only binding precedent from this Court, we held that a majority shareholder and chief executive officer had a fiduciary duty, as a matter of law, to deal fairly with the corporation's minority shareholder in connection with profits on the sale of a corporate asset. *Thywissen v. Cron*, 781 S.W.2d 682, 686 (Tex. App.—Houston [1st Dist.] 1989, writ denied). But we reached a different result in two subsequent unpublished opinions dealing with employment and management issues. *See Scherrer v. Haynes & Boone, L.L.P.*, No. 01-99-01164-CV, 2002 WL 188825, at * 2 (Tex. App.—Houston [1st Dist.] Feb. 7, 2002, no pet.) (not designated for publication); *Aitlqaid v. Soussan*, No. 01-98-01017-CV, 2001 WL

---

dominance and superiority"); *see also Heaton v. Rohl*, 954 N.E.2d 165, 175 (Ohio Ap. 2011) *appeal not allowed,* 954 N.E.2d 663 (Ohio 2011) (noting that, in closely-held corporations, heightened fiduciary duty applies to shareholder who "so dominated the corporation that he or she can be said to have been in control to the exclusion of the other").

[40] *See Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 435 (7th Cir. 1987); *Gerrard*, 285 F.Supp.2d at 1344 n.17; *Haussler v. Wilson*, 330 P.2d 670, 674 (Cal. Ct. App. 1958).

[41] *See Kaplan v. O.K. Techs., L.L.C.*, 675 S.E.2d 133, 137–40 (N.C. Ct. App. 2009), *review denied,* 690 S.E.2d 699 (2010); *Clearwater Trust v. Bunting*, 626 S.E.2d 334, 337 (S.C. 2006); *Merner v. Merner*, 129 Fed. Appx. 342, 344 (9th Cir. 2005); *Simmons v. Miller*, 544 S.E.2d 666, 675 (Va. 2001); *Olsen v. Seifert*, No. 976456, 1998 WL 1181710, at *4–6 (Mass. Super. Aug. 28, 1998); *Nixon v. Blackwell*, 626 A.2d 1366, 1380–81 (Del. 1993).

301430, at *3 (Tex. App.—Houston [1st Dist.] Mar. 29, 2001, no pet.) (not designated for publication). Neither *Scherrer* nor *Aitlqaid* discussed *Thywissen*.[42]

The vast majority of other intermediate appellate courts of this state have declined to recognize a formal fiduciary duty by a majority shareholder to a minority shareholder in a closely-held corporation while recognizing that an informal fiduciary duty could exist depending on the circumstances of the case.[43] Given this overwhelming weight of authority, we do not agree with Allen that Texas recognizes a broad formal fiduciary relationship between majority and

[42] *Thywissen* is distinguishable from *Scherrer* and *Aitlqaid*, as well as the cases generally holding that shareholders in a closely-held corporation do not owe each other a formal fiduciary duty. The duty imposed on the shareholder-officer in *Thywissen*—the duty to deal fairly with corporate assets—is one typically owed by corporate officers. Although that duty is generally owed to the corporation and not individual shareholders, the plaintiff-shareholder essentially stood in the shoes of the corporation, which the two shareholders had sold to a third party as part of the transaction in question. *See Thywissen*, 781 S.W.2d at 682–85.

[43] *See, e.g.*, *Willis*, 118 S.W.3d at 31 (holding that shareholder in closely-held corporation does not owe formal fiduciary duty to co-shareholders but could owe informal fiduciary duty under certain circumstances); *Pabich v. Kellar*, 71 S.W.3d 500, 504–05 (Tex. App.—Fort Worth 2002, pet. denied) (same); *Hoggett v. Brown*, 971 S.W.2d 472, 487–88 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (same); *Kaspar v. Thorne*, 755 S.W.2d 151, 155 (Tex. App.—Dallas 1988, no writ) (reversing judgment for plaintiff because shareholder in closely-held corporation did not owe co-shareholder fiduciary duty as matter of law and jury was not asked to find informal fiduciary duty); *but see Fisher v. Yates*, 953 S.W.2d 370, 379 (Tex. App.—Texarkana 1997, pet. denied) (stating that if company director had inside information that company was "about to be acquired, he stood in a fiduciary relationship" to minority shareholders with duty to disclose such information); *Gaither v. Moody*, 528 S.W.2d 875, 876 (Tex. App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.) (holding that director and majority shareholder of corporation that solicited proxies for merger had fiduciary relationship with minority shareholders).

56

minority shareholders in closely-held companies that would apply to every transaction among them. We therefore decline to recognize such a fiduciary duty between members of an LLC on this basis.

## 2. We recognize a formal fiduciary duty owed by a majority owner and sole manager of an LLC in the context of a redemption

Allen further contends that Rees-Jones's position as an insider, with not only a majority ownership interest but also dominant control over the business as the sole managing-member, is sufficient to create a formal fiduciary duty from Rees-Jones to Allen here. We therefore address whether such facts are sufficient to create a formal fiduciary duty in the context of a redemption.

### a. Rees-Jones has essentially the powers and responsibilities of a general partner, a role for which the law imposes fiduciary obligations

Partners in a general partnership owe each other a fiduciary duty. *M.R. Champion v. Mizell*, 904 S.W.2d 617, 618 (Tex. 1995); *Gregan*, 335 S.W.3d at 227–28. Similarly, a general partner in a limited partnership owes a fiduciary duty to the limited partners because of its control over the entity. *Crenshaw v. Swenson*, 611 S.W.2d 886, 890 (Tex. App.—Austin 1980, writ ref'd n.r.e.); *Johnson v. J. Hiram Moore, Ltd.*, 763 S.W.2d 496, 499 (Tex. App.—Austin 1988, writ denied); *McBeth v Carpenter*, 565 F.3d 171, 177 (5th Cir. 2009); *see also In re Harwood*, 637 F.3d 615, 621 (5th Cir. 2011) ("under Texas law, 'the issue of control has always been the critical fact looked to by the courts' in determining whether to

impose fiduciary responsibilities on individuals . . .") (quoting *Matter of Bennett*, 989 F.2d 779, 789 (5th Cir. 1993), *opinion amended on reh'g*, No. 91-1059, 1993 WL 268299 (5th Cir. July 15, 1993)). And we recently concluded that when a limited partner exercises control over the entity's operating affairs, he will also owe a fiduciary duty to the other limited partners. *Strebel v. Wimberly*, No. 01-10-00227-CV, 2012 WL 112253, at *10–11 (Tex. App.—Houston [1st Dist.] January 12, 2012). While a limited partner does not normally owe a fiduciary duty, such a duty "spring[s] into existence when a limited partner . . . wearing a different hat, exerts operating control over the affairs of the limited partnership." *Id*. at *12.[44]

LLCs have a number of characteristics similar to partnerships,[45] and courts in many jurisdictions have recognized a fiduciary duty between members of an

---

[44]    In pre-existing relationships outside the business context, dominance is a reason that courts recognize informal fiduciary relationships. *See generally R.R. St. & Co., Inc. v. Pilgrim Enters., Inc.*, 81 S.W.3d 276, 306 (Tex. App.—Houston [1st Dist.] 2001), *rev'd in part*, 166 S.W.3d 232 (Tex. 2005); *see also Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998) (stating that law recognizes confidential relationships when influence has been acquired and abused and confidence has been reposed and betrayed); *Pope v. Darcey*, 667 S.W.2d 270, 275 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) ("A confidential relationship exists where one person has a special confidence in another to the extent that the parties do not deal with each other equally, either because of dominance on one side or weakness, dependence, or justifiable trust on the other."). In closely-held corporations, a key factor for determining whether an informal fiduciary relationship exists is whether the majority owner exercises dominant control over the company. *Redmon v. Griffith*, 202 S.W.3d 225, 237 (Tex. App.—Tyler 2006, pet. denied); *Hoggett*, 971 S.W.2d at 488 n.13.

[45]    *See* Texas Practice: Business Organizations § 18.3; Debra Hatter & Rikiya Thomas, *Swimming in Unsettled Waters: Fiduciary Duties and Limited Liability Companies*, 49-Aug. Hous. Law. 22, 23 (2011) [herein, "Hatter & Thomas"].

LLC on that basis.[46] An LLC may be run by its members collectively, like a general partnership, or it may be run by one or more manager-members, like a limited partnership. *See* TEX. BUS. ORG. CODE ANN. § 101.251. As the sole member-manager of Chief with a high degree of control, Rees-Jones's position with Chief is similar to that of a general partner in a limited partnership.[47]

Rees-Jones was in charge of Chief's day-to-day operations. Articles five and six of Chief's articles of organization and article six of Chief's regulations gave Rees-Jones, as manager, control of its operations, other than certain significant actions like the sale of the company. His position also gave him intimate knowledge of Chief's daily affairs and plans. *See Miller v. Miller*, 700 S.W.2d 941,

[46] *See, e.g.,* 51 Am. Jur. 2d Limited Liability Companies § 11 (2012); *Patmon*, 280 S.W.3d at 596; *Pointer*, 918 N.E.2d at 808; *Bushi v. Sage Health Care, PLLC*, 203 P.3d 694, 699 (Idaho 2009); *Purcell*, 847 N.E.2d at 996; *McConnell v. Hunt Sports Ent.*, 725 N.E.2d 1193, 1214 (Ohio Ct. App. 1999); *Salm*, 799 N.Y.S.2d at 105; *see also* Hatter & Thomas, at 24 (stating that most jurisdictions recognize that "fiduciary duties are owed by managers in a manager-managed LLC and members in a member-managed LLC").

We have located only one Texas case that addresses whether formal fiduciary duties exist in the LLC context. *See Suntech Processing Sys., LLC. v. Sun Commc'ns. Inc.*, 2000 WL 1780236, at *6 (Tex. App.—Dallas 2000, pet. denied); *see also Pinnacle Data Services, Inc. v. Gillen*, 104 S.W.3d 188 (Tex. App.—Texarkana 2003, no pet.) (addressing informal fiduciary relationship in LLC context). In *Suntech*, the Dallas Court of Appeals declined to recognize a formal fiduciary relationship between members of an LLC. *Id.* The assertion of fiduciary duty in *Suntech* was based solely on the defendant-member's 80% ownership of the LLC. *Id.* at 5. It did not involve any allegations relating to control, nor did it discuss whether the defendant-member was a manager of the LLC. *Id.*

[47] Rees-Jones was also the only Chief employee who communicated with Allen about the redemption.

59

945–46 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (stating that majority shareholders' intimate knowledge of company's affairs supported finding fiduciary relationship); *Adickes v. Andreoli*, 600 S.W.2d 939, 945 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ dism'd) (holding that defendant's superior ability and expertise supported court's fact finding of confidential relationship); *Tuck v. Miller*, 483 S.W.2d 898, 905 (Tex. Civ. App.—Austin 1972, writ ref'd n.r.e.) (holding superior business expertise, among other factors, supported finding of confidential relationship). There is no evidence that Allen had such extensive knowledge of Chief's operations. To the contrary, in his deposition, Allen testified that he was a passive investor who "rarely if ever received any kind of 'status update' or financial information" regarding Chief's status and that Rees-Jones was his sole source of information on Chief's status over the years of his involvement with the company.

Thus, the relationship between Rees-Jones, as the majority owner and sole manager of Chief, and Allen, as a non-participating minority owner, is substantially similar to the relationship between the general partner and a limited partner in a limited partnership. The nature of this relationship supports recognizing a fiduciary duty between Rees-Jones and Allen with respect to Rees-Jones's operation and management of Chief.

### b. Redemptions are company actions in which insiders may have special knowledge and a personal interest

An additional reason to recognize a formal fiduciary relationship here is the specific type of transaction in question: a purchase of a minority owner's interest in the LLC. *Cf. Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007) (observing that courts consider all aspects of parties' relationship when determining nature and scope of any fiduciary duties). The nature of this particular transaction has resulted in many courts creating an exception to the general rule that a shareholder does not owe a fiduciary duty to co-shareholders. Under the so-called majority rule,[48] a director or officer who purchases another shareholder's stock does not have a fiduciary relationship with that shareholder and therefore has no disclosure obligation. 3A William M. Fletcher, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 18 at 272–73 (perm. ed., rev. vol. 2002). Under the so-called minority rule, directors and officers have a fiduciary duty to the corporation and to individual shareholders and therefore must disclose information related to the stock's value that they obtain through their position. *Id.* at 273, § 1168.10 at 276, 1168.20 at 279. Under the middle ground, the so-called "special facts" test, an officer or director has a limited

---

[48] Some courts question whether this is in fact the majority rule. *See Van Schaack Holdings, Ltd. v. Van Schaack*, 867 P.2d 892, 901 (Colo. 1994); *see also Bailey v. Vaughan*, 359 S.E.2d 599, 603−04 (W. Va. 1987).

61

fiduciary duty when purchasing stock from a shareholder. The fiduciary duty is limited to require disclosure of "those matters of which the officer has knowledge and about which the shareholder has a right to know, so that the latter may have the benefit of the information in judging the advantages of the deal. Information is material if there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder and would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *Id*. § 1171 at 284–85. Numerous courts have found that the special facts existing when an officer or director purchases a minority shareholder's stock in a closely-held corporation justify recognizing a formal fiduciary duty.[49]

The "special facts" test was adopted by the Dallas Court of Appeals in *Miller*, 700 S.W.2d at 946. Applying the test, the *Miller* court held that the jury's finding of a confidential relationship between the parties, together with the insider information the defendant-shareholder had about the value of the company's stock by virtue of his office, imposed a duty of disclosure on the defendant in a share-

---

[49] *See e.g., Lawton v. Nyman*, 327 F.3d 30, 39–40 (1st Cir. 2003); *Jordan*, 815 F.2d at 435; *Van Schaack Holdings*, 867 P.2d at 899; *Ajetlix Inc. v. Raub*, 804 N.Y.S.2d 580, 587−88 (N.Y. Sup. Ct. 2005); *Haussler v. Wilson*, 330 P.2d 670, 674 (Cal. Ct. App. 1958); *Gibbs v. Dodson*, 492 S.E.2d 923, 925–26 (Ga. Ct. App. 1997); *Mansfield Hardwood Lumber Co. v. Johnson*, 268 F.2d 317, 318–19 (5th Cir. 1959); *Blakesley v. Johnson*, 608 P.2d 908, 914 (Kan. 1980); *Cf. Chiarella v. United States*, 445 U.S. 222, 227–29, 100 S. Ct. 1108, 1114−15 (1980).

related transaction with his wife. 700 S.W.2d at 945−46. We agree with *Miller* that a shareholder and officer's material insider knowledge about corporate affairs may constitute "special facts" giving rise to a fiduciary duty of disclosure when purchasing shares from a passive shareholder, and we extend that holding to a member-manager's offer to redeem a minority member's interest in an LLC when that redemption will increase the member-manager's ownership.[50] While the *Miller* court relied on the doctrine to recognize a fact issue on whether an informal fiduciary relationship exists, the doctrine is a recognition of a formal fiduciary duty, as reflected in authorities cited by *Miller*[51] and numerous other courts.[52] Recognizing a formal fiduciary relationship, rather than a jury issue on whether an informal fiduciary relationship exists, creates the certainty and predictability needed for companies to manage prudently their affairs. Thus, we conclude that the

---

[50] Chief observes that the special facts doctrine has not been adopted by the Texas Supreme Court and contends that an intermediate court should not adopt this rule. But an intermediate court—the Dallas Court of Appeals in *Miller*—has already adopted this rule; the Texas Supreme Court elected not to disturb that holding; and numerous other courts have adopted this rule. *See* n. 50, *supra*.

[51] *See Strong v. Repide*, 213 U.S. 419, 433−34, 29 S. Ct. 521, 525−26 (1909) (applying special facts test and recognizing, as matter of law, fiduciary duty of disclosure when shareholder and principal officer with insider information about value of the shares purchases shares from another shareholder); *Hobart v. Hobart Estate Co.*, 159 P.2d 958, 432−33 (Cal. 1945) (endorsing "the rule that where an officer or a director of a corporation has knowledge of special facts affecting the value of its stock, he cannot deal with a stockholder at arm's length but is under a duty to disclose such facts before making a purchase or sale of the stock").

[52] *See. e.g.*, n. 50, *supra*.

"special facts" doctrine supports recognizing a formal fiduciary relationship when an LLC's member-manager communicates a redemption offer to the minority members that may benefit the member-manager individually.

The "special facts" are particularly acute when a majority owner and member-manager who controls the company's daily affairs, and therefore possesses inside information, communicates a  redemption offer that will increase his ownership of the company to minority members who do not participate in the company's daily affairs. Such an offer necessarily requires an evaluation of both the company's present value and its future prospects, an evaluation that the member-manager has a unique capacity to perform. Thus, Texas appellate courts have relied upon the unique nature of a redemption as part of the factors that may create an informal fiduciary duty. *See In re Estate of Fawcett*, 55 S.W.3d 214, 220 (Tex. App.—Eastland 2001, pet. denied) (holding that summary judgment evidence raised fact issue on informal fiduciary relationship and stating that officer or shareholder of closely-held company "may become" fiduciary to individual shareholders when company repurchases shareholder's stock or in shareholder transaction involving company officer or majority shareholder with dominant control over company's business and insider information about company); *Redmon v. Griffith*, 202 S.W.3d 225, 237–40 (Tex. App.—Tyler 2006, pet. denied) (holding that contract for repurchase of shareholder's stock in closely-held corporation may

create fiduciary relationship when majority shareholder dominates control over business or shareholders operate more as partners than in strict compliance with corporate formalities); *see also Willis v. Donnelly*, 118 S.W.3d 10, 31–32 (Tex. App.—Houston [14th Dist.] 2003) (stating that fiduciary relationship may be created "through the repurchase of a shareholder's stock in a closely held corporation" or "in certain circumstances in which a majority shareholder in a closely held corporation dominates control over the business"), *aff'd in part and rev'd in part on other grounds*, 199 S.W.3d 262 (Tex. 2006); *Hoggett v. Brown*, 971 S.W.2d 472, 488 n.13 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) ("in certain limited circumstances, a majority shareholder who dominates control over the business may owe such a duty to the minority shareholder"). But Rees-Jones rightly contends that an informal fiduciary relationship cannot be based on the nature of a redemption because "the relationship must pre-exist the deal, not rest on it." Rather than holding that the nature of the transaction, therefore, is "irrelevant," as Rees-Jones contends, we hold that it is part of the basis for recognizing a formal fiduciary relationship.

Rees-Jones further maintains that the nature of a redemption cannot support a fiduciary duty because the recognition of such a duty would result in few Texas companies exercising their redemption rights out of fear of breach of fiduciary duty claims. We note that the duty we recognize is owed by Rees-Jones, a majority

owner and manager with virtually unmitigated control over an LLC, not Chief itself—whether Chief owed Allen any fiduciary duties is not before this Court.

### c. Conclusion on formal fiduciary duty

We conclude that there is a formal fiduciary duty[53] when (1) the alleged-fiduciary has a legal right of control and exercises that control by virtue of his status as the majority owner and sole member-manager of a closely-held LLC and (2) either purchases a minority shareholder's interest or causes the LLC to do so through a redemption when the result of the redemption is an increased ownership interest for the majority owner and sole manager.[54]

---

[53] The scope of this fiduciary duty is not necessarily the same as for other fiduciary duties. One court has found that a director or officer who purchases shares from another shareholder has "a type of limited fiduciary duty" of disclosure of material facts but does not have a "comprehensive" fiduciary obligation "to prove to the jury that the sale was . . . fair and reasonable to the seller." *Jernberg v. Mann*, 358 F.3d 131, 136–37 (1st Cir. 2004); *see also Haussler v. Wilson*, 330 P.2d 670, 674 (Cal. Ct. App. 1958) ("'Under the 'special facts' doctrine a corporate officer owes a limited fiduciary duty in transactions with a shareholder involving the transfer of stock'"); *Van Schaack Holdings*, 867 P.2d at 897 (holding that officers or directors of closely-held corporations have fiduciary duty to disclose material facts affecting value of corporate stock in purchasing stock of minority shareholder under "special facts" doctrine). We do not decide the scope of Rees-Jones's fiduciary duty, as that issue was not before the trial court and is not before this Court.

[54] *See Lawton*, 327 F.3d at 39–40 (following special facts rule in recognizing fiduciary duty as a matter of law for officers who are majority owners to disclose material facts when insiders in closely-held firm buy stock from outsiders in person-to-person transactions or "causing the corporation to do so").

### 3. Rees-Jones's fiduciary duty of loyalty under the articles

Under section 7.001 of the Business Organizations Code (BOC), corporations and most other business organizations may, in their corporate documents, limit or eliminate the liability of their governing persons except that they may not eliminate liability for four specific categories of conduct, including breaches of the duty of loyalty, certain conduct not taken in good faith, transactions resulting in an improper benefit to the controlling person, and conduct for which liability is expressly provided by an applicable statute. TEX. BUS. ORG. CODE ANN. § 7.001(b), (c). Chief, however, was an LLC. LLCs are expressly excluded from section 7.001's statutory restriction on the limitation or elimination of liability for governing persons. *Id.* § 7.001(a)(1). Chief's members were thus free to expand or eliminate, as between themselves, any and all potential liability of Chief's manager, Rees-Jones, as they saw fit. *See id.* §§ 7.001(d)(3), § 101.401.

In the articles, Chief's members chose not to completely eliminate Rees-Jones's potential liability to Chief or its members, but instead, limited it to the same extent that corporations may limit the duties of their officers and directors. Largely tracking the language in section 7.001(c) of the BOC, Chief eliminated Rees-Jones's managerial liability *except* for:

(i) a breach of [Rees-Jones's] duty of loyalty to [Chief] or its members;

(ii) an act or omission not in good faith that constitutes a breach of

67

[Rees-Jones's duty] to [Chief] or an act or omission that involves intentional misconduct or a knowing violation of the law;

(iii) a transaction from which [Rees-Jones] received an improper benefit, whether or not the benefit resulted from an action taken within the scope of [his] office; or

(iv) an act or omission for which the liability of a manager is expressly provided by an applicable statute.[55]

Allen relies on Rees-Jones's "duty of loyalty to the Company or its members" in arguing that Rees-Jones owed him a fiduciary duty. The duty of loyalty is a fiduciary duty, though one with a particular scope. *See Bohatch v. Butler & Binion*, 977 S.W.2d 543, 545 (Tex. 1998); *Pride Int'l, Inc. v. Bragg*, 259 S.W.3d 839, 849 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pet. denied); *Landon v. S & H Mktg. Group, Inc.*, 82 S.W.3d 666, 672 (Tex. App.—Eastland 2002, no pet.).[56]

In his summary judgment motion, Rees-Jones contended that Chief's articles

---

[55] In its company regulations, Chief's members also chose to define the standard of care applicable to Rees-Jones's management of company affairs, requiring his "reasonable and best effort" to conduct Chief's business in a "good and businesslike manner" and eliminating liability for any breach of the duty of care not arising to "gross negligence or willful misconduct."

[56] Chief did not define or limit Rees-Jones's duty of loyalty in its company documents, nor does the BOC define the duty of loyalty in the LLC context. Typically, when our statutes are silent, we look to the common law for guidance. *See Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 295 (Tex. 1997) ("Because there is no statute addressing this issue, we look to the common law."); *see also Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 784 (Tex. 2006); *PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 87 (Tex. 2004).

68

"do not impose a fiduciary duty on Rees-Jones that would run personally to Allen."

He asserted that Chief's articles "list the exact duties Rees-Jones held as Manager"

and "create[d] duties," but the duties ran "to Chief and the [members] *collectively*,"

rather than to Allen and the other members individually.[57] Allen, in his summary

judgment response, contended that the articles created a duty not merely to Chief

but to him as well. Corporate officers may assume fiduciary duties to the

company's shareholders through a contract. *See Somers v. Crane*, 295 S.W.3d 5,

11 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *Grinnell v. Munson*, 137

S.W.3d 706, 718 (Tex. App.—San Antonio 2004, no pet.); *Fawcett*, 55 S.W.3d at

220. Because the parties assume that the articles created a fiduciary duty and limit

their contentions to the identity of that duty's beneficiary, we do the same.

We disagree with Chief's contention that Rees-Jones's "duty of loyalty to

[Chief] or its members" runs to Chief's members collectively but not

individually.[58] "Plural words may be reasonably interpreted to include the

---

[57] In his reply, Rees-Jones re-asserted that "the only duty created by Chief's articles is the duty of loyalty."

[58] Rees-Jones argues that the phrase "or its members" refers to the owners collectively, and therefore is only describing the duty to Chief itself. But if the phrase "or its members" is only another way to refer to Chief, as Rees-Jones contends, the phrase is superfluous because the duty to the company is stated in the same sentence. A court should interpret contractual provisions, when possible, to avoid making a provision meaningless. *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996); *SP Terrace, L.P. v. Meritage Homes of Tex., L.L.C.*, 334 S.W.3d 275, 281 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

singular." *Hill v. Boully*, No. 11-08-00289-CV, 2010 WL 2477868, at *3 (Tex. App.—Eastland June 17, 2010, no pet.) (mem. op.); *cf.* TEX. GOV'T CODE ANN. § 311.012(b) (West 2005) (providing that, in statutory construction, "[t]he singular includes the plural and the plural includes the singular"). Nothing in the language of Chief's articles indicates that the word "members" is intended to refer only to the members as a whole and not to include members individually or in groups of less than all. We will not narrow the interpretation of the word "members" to less than its plain and ordinary meaning absent some basis for doing so in the contract. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) ("Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense."); *see also Strebel*, 2012 WL 112253, at *10 (citing prior version of this opinion and interpreting provision in LLC agreement that "Managers shall have fiduciary duties to the Company and the Members" as including individual members).

Moreover, even if we were to conclude that the phrase "to [Chief] or its members" could reasonably refer to Chief's members collectively, to the exclusion of the individual members, the provision would be ambiguous at best, creating a question of fact for the jury. *See Italian Cowboy*, 341 S.W.3d at 333.

Rees-Jones thus has not conclusively proven that he did not owe a duty of loyalty to Allen under Chief's articles. Nor did Rees-Jones conclusively prove that

70

his duty of loyalty was not implicated by Chief's redemption of Allen's ownership interest. To the contrary, Allen asserts, and Rees-Jones has not denied, that Chief's 2004 redemptions resulted in an increase of Rees-Jones's ownership interest in Chief from 57.84% to 77.19%. Because the duty of loyalty places restrictions on a governing person's ability to participate in transactions on behalf of the company when the person has a personal interest in the transaction, Rees-Jones's involvement in the redemption implicates his duty of loyalty. *See, e.g.*, *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963) (describing when recovery is allowed against corporate fiduciary who realizes personal profits in matters of corporate interest); *Loy*, 128 S.W.3d at 407 ("The duty of loyalty dictates that a corporate officer or director must act in good faith and must not allow his or her personal interest to prevail over the interest of the corporation."); *Landon*, 82 S.W.3d 672 (same); *see also Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 722 (5th Cir. 1984) (addressing allegations that directors had personal pecuniary interest in issuance of debentures under fiduciary duty of loyalty); *Ruth v. Mims*, 298 B.R. 272, 288 (N.D. Tex. 2003) (observing that duty of loyalty restricts transactions "in which directors personally profit from the transaction or those which deprive the corporation of a profit opportunity"). Chief therefore failed to prove that Rees-Jones did not owe Allen a fiduciary duty of loyalty with respect to the redemption of his interest in Chief.

71

### 4. Conclusion

Because Chief has not conclusively proven that Rees-Jones did not owe Allen any fiduciary duty, the trial court erred to the extent it granted summary judgment on Allen's breach of fiduciary duty claim on this ground.

### Shareholder Oppression

Chief argues that it did not engage in oppressive conduct because it treated all members alike, made no effort "to push Allen out with some oppressive conduct," and was willing "to provide all members with all the information they would need to decide whether to redeem" so they could make their own "independent business decision." Allen responds that his shareholder oppression claim is based on other "wrongful conduct" represented by his fraud claims.

"The doctrine of shareholder oppression protects the close corporation minority stockholder from the improper exercise of majority control." Douglas Moll, *Majority Rule Isn't What It Used To Be: Shareholder Oppression In Texas Close Corporations*, 63 TEX. B.J. 434, 435 (2000). This court defines shareholder oppression as:

> (1) Majority shareholders' conduct that substantially defeats the minority's expectations that, objectively viewed, were both reasonable under the circumstances and central to the minority shareholder's decision to join the venture; or

> (2) Burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of

72

fair play on which each shareholder is entitled to rely.

*Willis v. Bydalek*, 997 S.W.2d 798, 801 (Tex. App.—Houston [1st Dist.] 1999, pet. denied); *see also Ritchie v. Rupe*, 339 S.W.3d 275, 289 (Tex. App.—Dallas 2011, pet. denied); *Redmon*, 202 S.W.3d at 234. "In deciding whether conduct rises to the level of oppression, courts must exercise caution, balancing the minority shareholder's reasonable expectations against the corporation's need to exercise its business judgment and run its business efficiently." *Ritchie*, 339 S.W.3d at 289. As we observed in *Davis v. Sheerin*, "Courts take an especially broad view of the application of oppressive conduct to a closely-held corporation, where oppression may more easily be found." 754 S.W.2d 375, 381 (Tex. App.—Houston [1st Dist.] 1988, writ denied). "The jury determines what acts occurred (assuming those facts are in dispute), but whether those acts constitute shareholder oppression is a question of law for the court." *Ritchie*, 339 S.W.3d at 289.

The conduct alleged in this case is not the typical wrongdoing in shareholder oppression cases: Allen was not a terminated employee; he was not denied access to company books or records; and there was no allegation that Rees-Jones wrongfully withheld dividends, wasted corporate funds, paid himself excessive compensation, or locked Allen out of the corporate offices. *Cf. Willis*, 997 S.W.2d at 802 (describing fact patterns in various shareholder oppression cases). Likewise, Allen presented no evidence that he was "squeezed-out" of the company. *Cf.*

*Redmon*, 202 S.W.3d at 235.

Allen focuses on the "wrongful conduct" of fraud by misrepresentations and omissions and breach of fiduciary duty. While Allen successfully raised a fact issue as to his fraud and fiduciary duty claims, he cites no case, nor can we find one, that extends shareholder oppression to include these causes of action. In addition, there is little necessity for this cause of action when the minority shareholder has non-disclosure and fiduciary duty claims. *Cf. Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 665 (Tex. 1999) (holding that when negligent design and strict liability design claims are functionally identical, "a trial court is not required to, and should not, confuse the jury by submitting differently worded questions that call for the same factual finding"). Because the complained-of actions by Chief are not similar to the previously recognized examples of shareholder oppression and Allen cites no case allowing conduct that is fraudulent or in breach of a fiduciary duty to be the basis of a shareholder oppression claim, we hold the trial court properly granted summary judgment on this claim.[59]

## Texas Securities Act

Chief sought summary judgment on Allen's TSA claims on the grounds that

---

[59] We express no opinion on whether a member of an LLC may assert a claim for shareholder oppression.

74

they are barred by the TSA's knowledge-based affirmative defense and by the statute of limitations. Allen challenges both grounds.

## A.    Knowledge of the untruth or omission

Under the TSA, a defendant-buyer is not liable if it "sustains the burden of proof that . . . the seller knew of the untruth or omission." TEX. REV. CIV. STAT. ANN. art. 581-33B (West 2010). Rees-Jones and Allen sought summary judgment on this affirmative defense, relying on Allen's knowledge that (1) natural gas prices had increased and therefore he believed Chief's value had increased during the eight months between the representations and the redemption and (2) the redemption agreement specifically provided that the redemption price reflected Chief's October 2003 value. We conclude that Allen's knowledge about the change in Chief's value has the same effect on Allen's TSA claims as it had on Allen's other fraud claims under the "justifiable reliance" requirement: it does not bar Allen's TSA claims except to the extent Allen alleges that Rees-Jones's representations communicated information about the suitability of the redemption price and the value of Chief and its assets at the time of the redemption.[60] Thus, as we did with Allen's other fraud claims, we hold that the trial court erred to the extent it relied on this defense to grant summary judgment on Allen's TSA claims,

---

[60]    Chief does not allege that Allen had actual knowledge of Chief's increased activity in the expansion area, the advancements in horizontal drilling, the success of competitors' wells in the area, or Chief's future prospects.

except that Allen may not assert that he was misled by Rees-Jones's statements as to Chief's value at the time of redemption, changes in Chief's value between October 2003 and the redemption, or the suitability of the redemption price.

## B.    Statute of limitations

Under the TSA, a defrauded seller must bring suit within "five years after the purchase," and within "three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence." TEX. REV. CIV. STAT. ANN. art. 581-33H(3)(a), (b) (West 2010). Allen filed suit just under three years after the redemption.[61] But Chief contends that Allen discovered or should have discovered the alleged fraud several months before the redemption, making his suit untimely.[62]

---

[61]    Allen filed suit on June 29, 2007. The redemption agreement is dated June 30, 2004.

[62]    Chief uses the term "inquiry notice," taken from federal case law interpreting the limitations period applicable to claims under the Securities Exchange Act of 1934. *See* 28 U.S.C. § 1658(b)(1) (providing that securities fraud claim under federal law must be brought within two years "after the discovery of the facts constituting the violation"). We decline to use that term and the federal case law applying that standard because of important differences between the language of the federal act and Texas's act. *See Anheuser-Busch Cos., Inc. v. Summit Coffee Co.*, 934 S.W.2d 705, 708 (Tex. App.—Dallas 1996, writ dism'd by agr.) (noting that TSA contained language "broader than that used in its federal counterpart" and therefore federal law interpreting the federal act "does not control our interpretation of" the TSA). Specifically, limitations under the federal act run from discovery of the "facts constituting the violation," while limitations under the Texas act run from discovery of the "untruth or omission" or the date on which such discovery "should have been made by the exercise of reasonable diligence." *Compare* 28 U.S.C. § 1658(b)(1), *with* TEX. REV. CIV. STAT. ANN. art. 581-

## 1.     When limitations began to run

Chief contends that limitations ran from the date Allen discovered or should have discovered its alleged fraud, which it contends was months before the redemption. Allen contends that the date of the fraudulent sale is the earliest date from which limitations may run. We give the statute its plain meaning and hold that subsection (a)'s five-year repose period runs from the date of the redemption and subsection (b)'s three-year limitations period runs from the date Allen discovered or should have discovered the alleged "untruth[s] or omission[s]," without reference to the timing of injury or damages.[63] *Id.* art. 581-33H(3)(b); *see*

*Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d 893, 901 (Tex. 2010) ("we begin with the

33H(3)(b). Additionally, the United States Supreme Court has recently interpreted the federal act's "discovery of the facts constituting the violation" as including scienter facts—i.e., a defendant asserting the affirmative defense of limitations is required to prove the date on which the claimant discovered not only that a material misrepresentation was made but also that it was made with an intent to deceive. *Merck & Co., Inc. v. Reynolds*, --- U.S. ---, ---, 130 S. Ct. 1784, 1796–98 (2010). The TSA, on the other hand, requires discovery of the "untruth or omission," rather the "violation," and intent-to-defraud is not an element of Allen's TSA claim. TEX. REV. CIV. STAT. ANN. art. 581-33B, F(1), H(3)(b); *cf. id.* art. 581-33F(2) (requiring intent for aider and abetter liability). In light of the differences in the language of the statutes' limitations provisions, we decline to find guidance in federal case law applying limitations under the federal securities act. We also note that the Supreme Court indicated in *Reynolds* that the "inquiry notice" standard could not be used to replace an actual showing of when a hypothetically reasonably diligent claimant would have discovered the facts constituting a violation, though it could "be useful to the extent [it] identif[ies] a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating." --- U.S. at ---, 130 S. Ct. at 1798.

[63]     A different limitations period may apply if the buyer has made a rescission offer under the TSA. *See* TEX. REV. CIV. STAT. ANN. art. 581-33H(3)(c), (d).

77

statute's text, relying whenever possible on the plain meaning of the words chosen.") (citations and quotations omitted).

Allen argues that we should not give section 33H(3)(b) this plain meaning because, under that interpretation, limitations could begin to run before a claimant has a legal injury, contrary to "sound logic and public policy." *See Span Enters. v. Wood*, 274 S.W.3d 854, 859 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (stating general rule that cause of action accrues when wrongful act causes legal injury). He asserts that beginning limitations before the sale, and therefore before his injury, "turns the discovery rule on its head" by shortening the limitations period.[64] But Allen conflates the common law discovery rule and the TSA's statutory discovery rule. The former is a judicially-crafted doctrine that tolls an otherwise applicable limitations period when the Legislature has been silent as to when a cause of action accrues. *See Moreno v. Sterling Drug, Inc.*, 787 S.W.2d

---

[64] We see no reason that the Legislature must afford more time to a claimant who discovered or should have discovered an untruth before a sale than to a claimant who discovered or should have discovered an untruth after a sale. Allen contends that applying the same time limit unfairly penalizes investors who discover or should have discovered an untruth or omission before the sale because such investors "cannot sue before the transaction because an essential element of his claim — a sale — had not occurred." In other words, an investor who discovered or should have discovered the untruth or omission more than three years before the sale could never timely file suit. But an investor who has knowledge of the fraud before the sale may choose not to participate in the sale and if he chooses to participate in the sale despite his knowledge, his claim is barred by TSA's knowledge defense. *See* TEX. REV. CIV. STAT. ANN. art. 581-33A(2), B. An investor who is not aware of the fraud but should be has three years to discover his claim, regardless of when the sale occurred.

78

348, 353 (Tex. 1990). The latter is a statute in which the Legislature has specifically defined the date from which limitations will run. *See* TEX. REV. CIV. STAT. ANN. art. 581-33H(3)(b). By enacting subsection (b), the Legislature displaced the common law discovery rule, replacing it with a discovery rule of its own crafting. *See Moreno*, 787 S.W.2d at 353 & n.3 (noting that, when Legislature prescribes specific event as commencing limitations, the courts have no need and no authority to alter that date with common law discovery rule).[65] The rule crafted by the Legislature here ties limitations to discovery of the untruth or omission, without regard to whether that discovery occurred or should have occurred before the sale. *See* TEX. REV. CIV. STAT. ANN. art. 581-33H(3)(b). We will not interject such a distinction.

Allen's insistence that we tie the limitations provision in subsection (b) to the date of sale also ignores the Legislature's choice of language. Subsection (b) is immediately preceded by another subsection, subsection (a), which *is* tied to the date of sale. *Id.* When the legislature uses certain language in one part of the statute and different language in another, we presume different meanings were intended.

---

[65] It is the Legislature's prerogative to weigh the underlying policy considerations to determine when, if ever, an otherwise valid claim may no longer be asserted. We have neither the authority nor the inclination to override the Legislature's decision. *See Iliff v. Iliff*, 339 S.W.3d 74, 79 (Tex. 2011) (stating that role of courts "is not to second-guess the policy choices that inform our statutes or to weigh the effectiveness of their results" but to "interpret those statutes in a manner that effectuates the Legislature's intent.") (quoting *McIntyre v. Ramirez*, 109 S.W.3d 741, 748 (Tex. 2003)).

79

*See Galveston Indep. Sch. Dist. v. Jaco*, 331 S.W.3d 182, 185–86 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (quoting *Sosa v. Alvarez–Machain*, 542 U.S. 692, 712 n.9, 124 S. Ct. 2739, 2754 n.9 (2004)).

Allen nevertheless maintains "that literal construction is contrary" to *Baxter v. Gardere Wynne Sewell LLP*, 182 S.W.3d 460 (Tex. App.—Dallas 2006, pet. denied). We disagree. The issue there was not whether the TSA's discovery rule began upon the discovery of the wrongful act; the defendant's contention was that limitations barred the plaintiffs' claim because they had discovered their injury more than three years before the lawsuit even though they did not know the identity of the wrongdoer. *Id.* at 463–64. The court agreed that it was unnecessary for the plaintiff to have discovered the wrongdoer's identity before limitations commences. *Id.* That holding is not inconsistent with our analysis here.[66] And the

---

[66] We are also unpersuaded by Allen's analogy to the DTPA's statute of limitations. The DTPA's discovery rule commences limitations after the date the consumer "discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading or deceptive act or practices." TEX. BUS. COM. CODE ANN. § 17.565. In *Cal Fed Mortgage Co. v. Street*, the Austin Court of Appeals rejected an argument similar to Allen's argument here. 824 S.W.2d 622, 625 (Tex. App.—Austin 1991, writ denied). The claimant admitted that he knew of the defendant's alleged deceptive practices on the dates when they occurred—all more than three years before he filed suit—but argued that limitations did not begin to run until years later, when he suffered damages. *Id.* The Austin court accorded the statute its plain meaning and held that limitations on the claimant's DTPA suit ran from the date he discovered the defendant's alleged deceptive acts. *Id.* This Court has twice agreed with the Austin court's holding. *See Holmes v. P.K. Pipe & Tubing, Inc.*, 856 S.W.2d 530, 537 (Tex. App.—Houston [1st Dist.] 1993, no writ); *Montgomery v. Ford Motor Credit Co.*, No. 01-09-00581-CV, 2010 WL 2431894, at *3 (Tex. App.—Houston [1st Dist.] June 17, 2010, no pet.)

*Baxter* court specifically observed that the TSA "expressly establishes the relevant inquiry for discovery rule purposes, *i.e.* discovery of the 'untruth or omission.'" *Id.* at 463. Moreover, the language in *Baxter* quoted by Allen (stating that the rule delays accrual of a cause of action until the plaintiff knew or should have known of the "injury") is in a discussion of the common law discovery rule, which the *Baxter* court recognizes is replaced by the TSA's "'built-in' discovery rule." *Id.*

Giving the statute its plain meaning, we conclude that Allen was required to file his suit within five years after the redemption, which he did, and within "three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence," which Chief contends he did not. *Id.* art. 581-33H(3)(a), (b).

### 2. When Allen should have discovered the untruth or omission

Chief contends that Allen should have discovered the alleged

---

(mem. op.). Allen argues the Texas Supreme Court implicitly overruled these cases in *KPMG Peat Marwick*, 988 S.W.2d at 749. But the issue in *KPMG* was not whether DTPA limitations ran from a date other than the date the claimant discovered or should have discovered the deceptive act when that date comes before the claimant suffers an injury; the issue in *KPMG* was whether the Texas Supreme Court had, in a prior case, created a "new formulation" of the common law discovery rule that delayed accrual until the claimant knew not only of the injury but of the "specific nature of each wrongful act that may have caused the injury." *Id.* The Court rejected this misinterpretation of its prior jurisprudence, holding that limitations under the DTPA had accrued when the claimant had suffered an injury that imposed a duty to investigate, investigated, and should have discovered the alleged wrongful conduct. *Id.* at 750. Moreover, even if *KPMG* implicitly overruled *Cal Fed Mortgage* and its progeny, the language adopted in the TSA's statute of limitations materially differs from that of the TSA.

misrepresentations and omissions more than three years before he filed suit. In its summary judgment motion, Chief supported this contention with evidence of Allen's actual knowledge, addressed above,[67] and also argued that its "summary judgment evidence shows that Allen was on inquiry notice well before" three years before the suit because "he had formed a subjective belief that the value of Chief had increased" and "[t]his subjective belief is a storm warning placing Allen on inquiry notice." We have already held that Allen's actual knowledge of Chief's increased value bars him from asserting a TSA claim based on Rees-Jones's statement regarding an expected decline in Chief's value; for the same reasons we held that knowledge did not bar Allen's remaining TSA claims, we hold that it does not commence limitations on those claims.

Chief also maintains that the "public record" contained facts that Allen should have discovered in the exercise of reasonable diligence. Specifically, Chief pointed to these public sources of information in its motion for summary judgment: (a) Texas Railroad Commission records, (b) an April 16, 2004 report on the Barnett Shale from Morgan Stanley, (c) an email sent by Raymond James, Allen's investment advisors, and a Goldman Sachs meeting preview, and (d) the

---

[67] Because we have already addressed the effect of Allen's actual knowledge under the TSA's knowledge-based affirmative defense, we need not address it again here. We address here Chief's argument based on information it claims Allen should have discovered by the exercise of reasonable diligence.

DrillingInfo.com website and news stories in the Fort Worth Star Telegram and Weatherford Democrat. Even if we were to assume that Allen was aware or should have been aware of these information sources, Chief has not met its burden of proof on limitations.[68]

### a. Railroad commission records

Citing to Allen's deposition, Chief asserted that Allen admitted that "Railroad Commission information is public," that he knew the commission's location, and that he could have gotten information from the Commission's website. But Chief failed to identify or cite to any specific information in the commission's publicly available records that it claimed would have revealed to Allen any of the alleged untruths or omissions. Nor did it include the unspecified railroad commission records in its summary judgment evidence or ask the trial

---

[68] On appeal, Chief attempts to rely on additional information available to Allen, particularly information in its records, to which it asserts Allen had a right of access. It contends that it preserved this argument in the trial court with statements in other sections of the summary judgment motion in which it asserted that Allen had access to Chief's books and records but chose not to review them. These statements do not identify any specific information in those records and are not sufficient to allow the trial court to conclude that, as a matter of law, Rees-Jones and Chief were entitled to summary judgment on the ground that there was information in Chief's records that Allen reasonably should have discovered before June 29, 2004 that would have revealed the untruthfulness of one or more of the actionable statements in Rees-Jones's October 2003 letter.

Similarly, while Chief has consistently taken the position that Texas law imputes to Allen all information available in public records, we look only to the specific information identified by Chief in its summary judgment motion as commencing limitations, as these were the only grounds before the trial court.

court to take judicial notice of such records. Chief thus failed to prove conclusively the date on which Allen should have been aware of information in the railroad commission's public records that revealed one or more of the untruths or omissions underlying his TSA claims. *See Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005) ("A defendant moving for summary judgment on the affirmative defense of limitations has the burden to establish conclusively that defense, including the accrual date of the cause of action."); *Villarreal v. Wells Fargo Brokerage Servs., LLC*, 315 S.W.3d 109, 118 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (stating that, when claimant discovery rule is pled, moving defendant has "dual burden" of conclusively proving date of accrual and date when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the wrongful act and resulting injury).

### b. April 16, 2004 Morgan Stanley report

In its summary judgment motion, Chief pointed out that Allen admitted that an April 16, 2004 report on the Barnett Shale from Morgan Stanley was available to him. Here too, Chief did not identify or cite any specific information in this report that it contended would have revealed to Allen one or more of the alleged untruths or omissions.[69] Chief thus failed to establish, as a matter of law, the date

---

[69] Chief included the Morgan Stanley report in the summary judgment record and cited to the report once, in the factual section of its motion: "Bottom-line: the jury

84

on which Allen should have been aware of information in the Morgan Stanley report that revealed one or more of the untruths or omissions underlying his TSA claims. *See Rubio*, 185 S.W.3d at 846; *Villarreal*, 315 S.W.3d at 118.

### c. Raymond James email and Goldman Sachs meeting preview

Chief stated in its summary judgment motion, "By the Spring/Summer of 2004 other analysts had publicly published their opinions on the Barnett Shale to Goldman Sachs and J.P. Morgan," citing to an email from Raymond James Energy Group containing its "stat of the week" and a preview for an analyst meeting prepared by Goldman Sachs. Chief did not assert or attempt to prove that Allen received or should have obtained either the email or the meeting preview. Chief did not identify or discuss any specific information in the Goldman Sachs document that it contended would have revealed to Allen one or more of the alleged untruths or omissions.[70] The only information in the Raymond James email Chief discusses is this statement near the end of the email: "If you have further questions, please contact any of the following members of the Raymond James Energy Team at . . . ." Chief does not attempt to show what information Allen would have or should have discovered if he had contacted the Raymond James

---

is still out on whether horizontal drilling can be successful across the entire non-core area." Chief made no argument tying this statement to its limitations defense.

[70] Chief did cite to the twenty-six page, partially-illegible exhibit as a whole.

team or how that information would have revealed one or more alleged untruths or omissions. Chief thus failed to establish, as a matter of law, the date on which Allen should have been aware of information in the Raymond James email or Goldman Sachs meeting preview that revealed one or more of the untruths or omissions underlying his TSA claims. *See Rubio*, 185 S.W.3d at 846; *Villarreal*, 315 S.W.3d at 118.

### d. News stories and the DrillingInfo.com website

Finally, Chief asserted in its motion for summary judgment: "In addition, public newspapers such as the *Fort Worth Star Telegram* and *Weatherford Democrat* carried stories on the Barnett Shale and operators during the same period. And websites such as DrillingInfo.com were available with detailed summaries of well information." Again, Chief did not identify or discuss any specific information contained in these sources that it contended would have revealed to Allen one or more of the alleged untruths or omissions. Chief thus failed to establish, as a matter of law, the date on which Allen should have been aware of information in the news stories or on the DrillingInfo.com website that revealed one or more of the untruths or omissions underlying his TSA claims. *See Rubio*, 185 S.W.3d at 846; *Villarreal*, 315 S.W.3d at 118.[71]

---

[71] Chief argues in its sur-reply that limitations began to run when Allen signed the redemption agreement on June 22, 2004, rather than when the agreement became effective on June 30. Having reviewed the motion for summary judgment, we

## C.    Conclusion

Chief failed to prove conclusively that Allen "knew of the untruth[s] or omission[s]" that are the basis of his TSA claims or that the statute of limitations had expired on those claims, except that Allen may not assert that he was misled by Rees-Jones's statements as to Chief's value at the time of redemption, changes in Chief's value between October 2003 and the time of redemption, or the suitability of the redemption price. The trial court therefore erred to the extent it granted summary judgment on Allen's TSA claims on this ground, except as to any TSA claim in which Allen alleges he was misled as to the value of Chief and its assets at the time of redemption or the redemption price.

## Damages

Chief moved for summary judgment on the ground that Allen had no recoverable damages as a matter of law. It argued that Allen cannot recover damages based on the difference between what his shares were worth at the time of redemption and the subsequent sale of the company in 2006 because (1) those damages are too speculative as a matter of law and (2) the TSA limits his damages

---

agree with Allen that Chief did not raise that issue before the trial court. We therefore do not address it. *See* TEX. R. CIV. P. 166a(c); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) ("A [summary judgment] motion must stand or fall on the grounds expressly presented in the motion.").

to the value of his shares "as of the date of the sale." [72] Allen responded that he is entitled to such recover damages based on disgorgement of the increased value received by Rees-Jones, that they are not too speculative, and that they are recoverable under the TSA as "income."

## A.    Equitable remedy of disgorgement

As an initial matter, Chief's summary judgment motion challenged Allen's claim for actual damages and not whether he could recover the equitable remedy of disgorgement. *See Robertson v. ADJ P'ship, Ltd.*, 204 S.W.3d 484, 494 (Tex. App.—Beaumont 2006, pet. denied) (stating that "disgorgement of profits has long been recognized as an appropriate remedy for fraud"); *see also Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 187 (Tex. App.—Houston [1st Dist.] 2005, no pet.). But Allen's common law fraud and breach of fiduciary duty claims do not require him to show that he suffered actual damages. *See Italian Cowboy*, 341 S.W.3d at 337 (listing "injury" among elements of fraud claim, but not "damages"); *Plotkin v. Joekel*, 304 S.W.3d 455, 479 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (listing "injury to the plaintiff, or benefit to the defendant"

---

[72]    Chief also argued that Allen cannot recover damages based on the difference between what he received for his shares and what his shares were worth at the time of redemption because he expressly contracted for the October 2003 price instead of the time-of-redemption price. Because we conclude that Chief has not established conclusively that Allen has no recoverable damages under the measure of damages discussed above, we need not reach the issue of whether Allen could also recover damages under this measure of damages.

among elements of breach of fiduciary duty claim, but not "damages"); *see also*

*ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 874 (Tex. 2010) (noting

that disgorgement and fee forfeiture are equitable remedies intended to prevent

abuses of trust, "regardless of proof of actual damages"); *Bonanza Rests. v. Uncle*

*Pete's, Inc.*, 757 S.W.2d 445, 448 (Tex. App.—Dallas 1988, writ denied) (holding

that jury's answer of $0 in damages caused by fraud did not preclude claimant

from recovering rescission of franchise agreement induced by defendant's fraud).

Thus, Chief's challenge to Allen's damage models is not, alone, sufficient to defeat

Allen's right to any recovery on those claims. *See Burrow v. Arce*, 997 S.W.2d

229, 237–45 (Tex. 1999) (holding that trial court erred in granting summary

judgment against breach of fiduciary duty claimants on ground that there were no

actual damages). Regardless, we conclude that Chief did not establish that Allen

has no recoverable actual damages as a matter of law.

**B.      Damages based on value accrued after the date of sale**

  **1.      Damages under the common law: speculativeness[73]**

Chief contends that Allen's damages claim based on Chief's value two years

after he sold his interest is an attempt to "'ride' the market risk-free, suffering no

---

[73] The parties do not argue a distinction between the damages available under the common law and those available under section 27.01 of the Business and Commerce Code. *See* Tex. Bus. & Com. Code Ann. § 27.01. We therefore treat them the same.

loss if the market goes down, but participating in gains in hindsight if the market goes up" and to "rewrite the deal so he can receive all of the upside from Chief's post-2004 market increase without ever having shared any of the post-June 2004 risk." It asserts that "Texas law does not allow this sort of speculative remedy," citing *Miga v. Jensen*, 96 S.W.3d 207, 216–17 (Tex. 2002) and *Reardon v. LightPath Tech.*, 183 S.W.3d 429, 441–42 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Allen challenges these arguments.

### a. *Miga* and *Reardon*

In *Miga*, an employer granted an employee, Miga, an option to purchase stock in a privately-held corporation but refused to honor the option after the employee was discharged. 96 S.W.3d at 209–10. The trial court rendered judgment for Miga on his breach of contract claim and awarded him lost profits based on the value of the stock at the time of trial—three years later, during which time the company had gone public and undertaken a stock split. *Id.*

The Texas Supreme Court held that Miga could not recover the "lost profits" awarded under his breach of contract claim:

> [Miga's] only evidence of "lost profits" was the increased market value of [the company's] stock, and the jury's award coincided with the stock's market value at the time of trial. But an increase in the market value of goods never delivered under a contract is not the same as lost profits. Lost profits are damages for the loss of net income to a business measured by reasonable certainty. Here, there was no evidence before the jury that Miga suffered reasonably certain business losses resulting from Jensen's breach. . . . Miga did not

90

testify about what particular profit he expected, or that the parties contemplated a particular resale of the stock; in fact, Miga testified that he would not have sold it.

*Id.* at 213. The Court stated that "the rule in Texas has long been that contract damages are measured at the time of breach, and not by the bargained-for goods' market gain as of the time of trial." *Id.* at 214.

The Court rejected Miga's argument that not allowing him to recover the increase in the stock's value effectively rewarded the employer for his breach, noting that the employer might benefit from the post-breach increase in the stock's value but had also assumed the risk of any decrease in the stock's value. *Id.* at 216. Awarding Miga damages based on the appreciated value of the stock, on the other hand, would have "ma[d]e him better off than he would have been had the agreement been honored by giving him an investment free of the risks other shareholders undertook." *Id.* "More importantly," the Court stated, "trying to determine what part of the stock's appreciation Miga would have realized had he obtained the stock in December 1994 is too speculative." *Id.* at 216–17.

In *Reardon*, the Fourteenth Court of Appeals relied on *Miga* to reject the "highest intermediate value" theory of damages in a securities fraud action. 183 S.W.3d at 441.[74] After concluding that the shareholder-plaintiffs had not presented

---

[74] Contrary to Chief's assertion, there is no evidence that the Devon sale "occurred at the height of the Barnett Shale market."

91

any evidence of "rescissory damages" because they failed to account for the purchase price they received for their shares, the *Reardon* court also noted that the testimony of the plaintiffs' expert relied on an unsupported assumption that the shareholders would have converted their shares on the date of the shares' highest value. *Id.* at 440. In light of the Supreme Court's analysis in *Miga*, the *Reardon* court held that this damages theory, which adopted the "highest intermediate value" of the shares without evidence that the shareholders would have actually sold at that value, was too speculative and would give the shareholders a "windfall yielded from a riskless investment in a high-risk field." *Id.* at 441–42.

### b. Allen's damages claim

*Miga* and *Reardon* do not preclude Allen's damages claims for two reasons—one procedural and one substantive. Procedurally, unlike *Miga* and *Reardon*, where the plaintiffs had been put to their burden of producing evidence to raise a fact issue on damages, this is an appeal from a traditional summary judgment in which Allen bore no evidentiary burden on damages. *See Miga*, 96 S.W.3d at 209; *Reardon*, 183 S.W.3d at 431. The missing evidence necessary to provide reasonable certainty in *Miga* and *Reardon* may yet be forthcoming here. *Cf. Miga*, 96 S.W.3d at 213 (noting that there was no evidence that Miga "suffered reasonably certain business losses" when he "did not testify about what particular profit he expected, or that the parties contemplated a particular resale of the

stock"); *Reardon*, 183 S.W.3d at 439–40 (noting that claimants' damages expert "pile[d] speculation upon speculation" by assuming what shareholders would have done with their shares, without ever having talked to a single investor). While the courts in *Miga* and *Reardon* rightfully held the claimants accountable for their failure to support their damage models with evidence, we may not hold Allen accountable for failing to present supporting evidence when he had no burden to do so. *Cf. Miga*, 96 S.W.3d at 209; *Reardon*, 183 S.W.3d at 431.[75]

Ultimately, the speculativeness of Allen's damages model is, at this point, itself speculative. Although Chief asserts that Allen seeks to recover under the

---

[75] We note that some of the circumstances of this case may make it easier for Allen to meet his evidentiary burden on damages, when he is put to that burden, than it was for the claimants in *Reardon*. First, *Reardon* involved forty-five claimants. It might have been difficult to establish the date on which each of those claimants would have sold their shares (or exercised their warrants) but for the alleged fraud; instead of trying, the claimants employed a damages model that simply assumed a single date—the date that maximized the damages claim—for all claimants. Allen is only one claimant, and he may present evidence tending to show the date on which he would have sold his interest in Chief if he had not redeemed it in 2004. Second, unlike the company in *Reardon*, which went public at the time of the alleged fraud, Chief remained a closely-held company at least until the sale to Devon in 2006. Thus, Allen's opportunities to sell his interests were severely limited—there may, in fact, have been no opportunities before the 2006 sale to Devon. Finally, while *Reardon* involved a complicated scheme of updating stock based on a company's performance, this case involves a only stock redemption and subsequent sale. The same is true for *Miga*. In *Miga*, nothing indicated when or if the injured employee would have sold the stock if he had acquired it. 96 S.W.3d at 213, 216. Allen, in contrast, asserts the 2006 sale provides a clear date on which all ownership interests in Chief were sold. Chief asserts that the 2006 sale is too attenuated from Allen's 2004 redemption decision because a factfinder must speculate that Allen would have kept his entire interest for the two years between the redemption and the 2006 sale. But nothing in the record indicates Allen could have sold his interest during this intervening two years.

"highest intermediate value" damages model rejected in *Reardon*, neither Allen's pleadings nor the summary judgment evidence limit Allen to that damages model. If the evidence at trial established how many shares Allen would have kept but for Rees-Jones's allegedly fraudulent statements and the date on which he would have subsequently sold those shares, the mere fact that the shares had a high, or even their highest, value on that date does not convert Allen's damage theory into a speculative theory that simply assumes a date of sale or conversion. *Cf. Reardon*, 183 S.W.3d at 441–42 (noting that federal courts do not apply "highest intermediate value" theory, but instead, allow the jury to determine a reasonable time in the future when claimants would have sold their stock).[76]

*Miga* does not preclude Allen's damages for a second, substantive reason—it does not address damages recoverable under Allen's causes of action: fraud, breach of fiduciary duty, and the TSA. As the Court described it, "This is a classic breach of contract case; *Miga* has no cause of action for fraud." *Id.* at 211. This is not a breach of contract case, and it is not limited to breach of contract damages

---

[76]   Chief also relies on other cases in which a damages theory is rejected as too speculative because it is based on too many assumptions. *See Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 650 (Tex. 1994); *Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 824–25 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). Those cases involved, respectively, an instructed verdict and a final judgment. *See Szczepanik*, 883 S.W.2d at 649; *Ramco Oil & Gas Ltd.*, 207 S.W.3d at 807. Thus, these cases are subject to the same distinction—the assumptions that made the plaintiff's damages theory too speculative there ultimately may be proven, rather than assumed, here.

models.[77] Chief's reliance on *Miga* is thus misplaced.

Chief also relies on Allen's testimony in which he stated that he was unable to say how many shares of his stock he would have declined to redeem if Rees-Jones had disclosed specific information to him, repeatedly referring to his answers as "speculation." We agree that if Allen is unable to present legally and factually sufficient evidence at trial as to the number of shares he would have kept but for the alleged fraud, his damages may be too speculative to submit to the jury. But we are not persuaded that his use of the term "speculation" constitutes a magic word that renders Allen's damage claims speculative as a matter of law. We look to the substance of Allen's answers to determine their import. *See State Farm Fire & Cas. Co. v. Rodriguez*, 88 S.W.3d 313, 319 (Tex. App.—San Antonio 2002, pet. denied) (although expert testified that his opinion was a "wild ass guess," a court must nevertheless look at context in which term was used to determine its reliability), *abrogated by Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20 (Tex. 2008). Allen was asked what he would have done if certain,

---

[77] Unlike a contract case, the law favors granting the benefit of the delay to the victim of the fraud. *See Janigan*, 344 F.2d at 786 (noting that even though unforeseeable increases in value after security sold to fraudulent party are speculative, "[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them."); *Jordan*, 815 F.2d at 441 (stating that courts award damages "based on defendants' gain [to] make the fraud unprofitable and therefore deter wrongdoing.").

specific pieces of information had been disclosed to him and repeatedly answered that his actions would have depended on the context as a whole. He testified as to what he believed he would have done under some circumstances, what he "would have presumably done" under other circumstances, and that his previous conduct could be used as an indicator of what he would have done. This testimony neither renders Allen's damages speculative as a matter of law nor precludes him from presenting more specific evidence at trial of what interest he would have retained and when he would have sold that interest but for Chief's alleged fraud.

Finally, we note that the damages that Chief challenges as too speculative to be recovered as actual damages[78] may be available in disgorgement, an equitable remedy it has not contested. *See ERI Consulting*, 318 S.W.3d at 873 ("courts may fashion equitable remedies such as profit disgorgement and . . . may disgorge all ill-gotten profits from a fiduciary when a fiduciary agent usurps an opportunity properly belonging to a principal"). The uncertainties (at this stage of the proceeding) as to how many shares Allen would have kept absent the alleged fraudulent inducement and when he would have sold those shares do not pose an obstacle to a potential disgorgement remedy because there is no dispute over what

---

[78]     In his petition, Allen requested as damages for common law fraud "a rescissionary quantum of damages measured by the value of the interests on the date of the redemption, plus the gain realized by Chief attributable to Allen's interests with the sale of Chief, as reflected by the price at which Devon agreed and purchased all outstanding membership interests in Chief."

Devon paid to acquire Chief. *Cf. Ritchie*, 339 S.W.3d at 299–300 (rejecting argument that award should have been calculated according to value of the stock on date of injury because trial court's judgment reflected "award of equitable relief—not damages").[79]

## 2. Damages under the TSA

Section 33D(4) of the TSA entitles a defrauded seller to recover "(a) the value of the security at the time of sale plus the amount of any income the buyer received on the security, less (b) the consideration paid the seller for the security plus interest thereon at the legal rate from the date of payment to the seller." *See* Tex. Rev. Civ. Stat. Ann. art. 581-33D(4). Relying on this provision, Chief asserts that "the TSA statutorily limits damages to a difference in value 'as of the date of the sale.'" *See id.* Allen responds that "income" includes a defrauding buyer's profits on a subsequent sale of the wrongfully obtained shares. Neither party has unearthed authority that directly addresses this issue.

We conclude that "income" does not include the defrauding buyer's

---

[79] On rehearing, Chief characterizes the damages sought by Allen as direct damages and contends that *Miga* and *Arthur Anderson & Co v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997), recognize "a per se rule" that direct damages in a fraud claim are measured as of the time of the sale or fraud. We disagree. First, Chief's contention does not address Allen's claim for disgorgement. Second, Allen specifically pleaded that he was seeking consequential damages—to the extent that Allen seeks damages measured by the loss he allegedly sustained by not retaining his interest, those damages are consequential in nature.

proceeds[80] on a subsequent sale. A holding to the contrary would result in the defrauded seller recovering the value of the shares as of the date of the fraudulent sale twice—once for "the value of the security at the time of the sale" and then again as part of the income from the fraudfeasor's resale, which would include the original value of the shares plus any increase in value after the date of the fraudulent sale.[81] *See id.* Also, the interpretation of "income" proposed by Allen has illogical consequences when applied to other subsections of section 33D. For example, if "income" includes the income from a subsequent sale of the stock, section 33D(3) would under-compensate a defrauded buyer who subsequently sold his stock.[82] Interpreting the term "income" to include dividends and other such

---

[80]    We note that Allen substitutes the term "profit" for "income," arguing that he may recover Rees-Jones's "profit" on the subsequent sale. Using "profit," rather than "income," to calculate damages lessens, but does not eliminate, the double recovery issue: the defrauded seller recovers the difference between what he was paid and the actual value of the shares at the time of sale twice, instead of recovering the entire value of the shares at the time of sale twice. And, the statute uses the word "income," not "profit." These two terms have different meanings—one accounts for expenditures and the other does not. *See, e.g.*, BLACK'S LAW DICTIONARY 778 (9th ed. 2009) (defining "income" and "profit" accordingly).

[81]    For example, if a shareholder was defrauded into selling his shares for $5 when they were actually worth $10, and the fraudfeasor later re-sold those shares for $15, the defrauded seller would recover $20: the difference between the value of his shares at the time of the fraudulent sale and the price he received ($5) plus the income from the re-sale ($15): $5 + $15 = $20. But the shares were never worth $20—the seller's recovery exceeds the defrauder's profits and any profit he reasonably could have expected on the shares if he had kept them.

[82]    Section 33D(3) entitles a defrauded buyer to recover the consideration he paid for the shares with interest, less either (i) the value of the security at the time he later sold it *plus* the amount of any "income" he received on the security or (ii) the

typically periodic payments, but not profits on a subsequent sale, is more consistent with the plain meaning of the word and the compensatory purpose of the statute in light of the manner in which the term "income" is used throughout the statute. *See* BLACK'S LAW DICTIONARY 778 (9th ed. 2009) (defining "income" as "[t]he money or form of payment one receives, usu[ally] periodically, from employment, business, investments, royalties, gifts, and the like"); TEX. GOV'T CODE ANN. § 311.011(a) ("Words . . . shall be read in context and construed according to the rules of grammar and common usage."); *id.* § 311.023 ("In construing a statute . . . a court may consider . . . [the] object to be obtained . . . [and the] consequences of a particular construction"). Thus, we hold that Allen may not recover the amount paid by Devon to acquire the ownership interest in Chief previously owned by Allen as "income" under the TSA. Chief has not proven, however, that Allen did not have other damages under the TSA, such as distribution income.[83]

---

actual consideration received for the security when he later sold it *plus* the amount of any "income" he received on the security. TEX. REV. CIV. STAT. ANN. art. 581-33D(3). If income includes the income from a subsequent sale, a defrauded buyer who pays $10 for shares that are worth only $5 at the time he bought them, and who later sold those shares for $2 (the value of the shares at the time of that sale), would recover only $6 (exclusive of interest): the price he paid ($10) less the value/price of the stock when he disposed of it plus any income ($2 + $2 = $4): $10 - $4 = $6. Essentially, the price of the stock at the time he disposed of it ($2) is counted against the defrauded buyer twice.

[83] Section 5.2 of Chief's regulations expressly provides for distributions to members.

C.    **Conclusion on damages**

We hold that Chief has not established its right to judgment as a matter of law on any of Allen's claims on the ground that Allen has no damages.

**Conclusion**

Chief did not prove that the terms of the redemption agreement bar Allen's statutory and common law fraud claims as a matter of law, and because there is an issue of fact on Allen's fraudulent inducement claims, there is necessarily an issue of fact on the enforceability of the agreement's releases. Nor did Chief conclusively prove that Rees-Jones did not owe Allen a fiduciary duty, that Allen's claims fail for lack of damages, or that limitations had run on Allen's TSA claims.

Chief did conclusively prove that Allen cannot prevail on his shareholder oppression claim and that the Rees-Jones's statements about the difficulty of creating new value in the oil and gas business and his expectations for Chief's continued growth are opinion statements that are not actionable in fraud. With respect to Rees-Jones's written statements regarding the expansion area of the Barnett Shale, drilling technology, and the expected impact of these considerations on Chief's value, Chief has not established that Allen cannot rely on these statements to the extent Allen alleges that these statements misled him about Chief's future prospects and induced him to redeem his interest in June 2004 when he otherwise would not have done so; Chief has, however, established that Allen

100

could not justifiably rely on these statements—and, with respect to his TSA claims, is barred by his actual knowledge from asserting a claim—to the extent Allen alleges that these statements misled him about Chief's value at the time of the redemption, the change in Chief's value between October 2003 and the time of redemption, or the suitability of the redemption price.

We therefore affirm the trial court's summary judgment with respect to:

- shareholder oppression

- common law and statutory fraud (including TSA) arising out of oral representations by Rees-Jones and the following written representations:

  o "I frankly consider creating new value of $5 million per year consistently in the oil and gas business to be very difficult."

  o "I don't expect our growth to continue at this pace, which has been nothing short of phenomenal."

- common law and statutory fraud (including TSA) arising out of Rees-Jones's written statements to the extent they allegedly misled Allen about the value of Chief or its assets at the time of redemption, the change in that value between October 2003 and the time of redemption, or the suitability of the redemption price.

We reverse the remainder of the judgment and remand for further proceedings consistent with this opinion.

Harvey Brown
Justice

Panel consists of Justices Higley, Brown, and Halbach.[84]

---

[84] The Honorable Joseph "Tad" Halbach, Judge of the 333rd District Court of Harris County, participating by assignment.